Filed 10/14/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re R. L., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. CYNTHIA C. et al., Defendants and Appellants. | D069729 (Super. Ct. No. SJ13064) |

APPEAL from an order of the Superior Court of San Diego County, Kenneth J. Medel, Judge. Affirmed.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant Cynthia C.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant Gerardo L.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Appellant.

Cynthia C. and Gerardo L. appeal from orders terminating parental rights to their daughter, R. L.  Gerardo contends the jurisdictional and dispositional findings and orders, and all subsequent orders, must be reversed because the juvenile court did not have home state jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act, Family Code section 3400 et seq. (UCCJEA).[1]  He also contends the orders must be reversed because he did not receive notice of the proceedings pursuant to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638) (the Hague Service Convention or Convention).  Cynthia joins in Gerardo's arguments to the extent they inure to her benefit, but raises no other issues.

The facts of this case present an interesting issue concerning "home state" jurisdiction, as defined by the UCCJEA.  R. L. was born in a hospital in San Diego County.  Her mother, Cynthia, is a United States citizen.  For approximately three years prior to R. L.'s birth, Cynthia did not have a permanent residence.  She alternated her time between Tijuana and Las Vegas, but had been primarily living in Tijuana in the months preceding R. L.'s birth.  R. L.'s father, Gerardo, is a Mexican national who stayed at various places in Baja California, including an aunt's home in Tijuana.  Gerardo could not legally enter the United States.  During the juvenile dependency proceedings, both

---

[1]     Unless otherwise indicated, further statutory references are to the Family Code.

2

parents became incarcerated. Gerardo was in prison in Baja California. Cynthia was in federal prison in San Diego County. Upon her release from prison, she was prohibited from entering Mexico for three years.

For reasons we shall explain, we conclude that the juvenile court erred when it determined that California was R. L.'s home state under section 3421, subdivision (a). We hold that a temporary hospital stay in a state incident to birth, by itself, is insufficient to confer home state jurisdiction under the UCCJEA. In addition, a social services agency does not become "a person acting as a parent" for purposes of home state jurisdiction by detaining a child in protective custody in an emergency.

We also conclude that the error does not require reversal. The juvenile court had emergency jurisdiction under section 3424 because R. L. was present in California and it was necessary in an emergency to protect her from mistreatment or abuse. Moreover, any alleged procedural error, including the failure to contact the Mexican court, does not constitute a miscarriage of justice. (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836; *In re C.T.* (2002) 100 Cal.App.4th 101, 111 (*C.T.*).)

Finally, we reject Gerardo's claim he did not receive proper notice of the proceedings. The Hague Service Convention does not apply where the parent's whereabouts are unknown and a diligent search has been made to locate the parent. The record clearly shows the San Diego County Health and Human Services Agency (Agency) diligently tried to locate Gerardo from the time R. L. was detained in protective custody. Moreover, when Gerardo's whereabouts became known, the Hague Service Convention did not apply because Gerardo voluntarily submitted to the jurisdiction of the

3

juvenile court. We therefore affirm the orders terminating parental rights and freeing R. L. for adoption by her caregivers.

## FACTUAL AND PROCEDURAL BACKGROUND

Cynthia C. is the mother of R. L., who is now two years old. Cynthia, a United States citizen, entered California from Mexico to give birth to R. L., who was born at Sharp Chula Vista Medical Center in San Diego County in August 2014. Cynthia and R. L. tested positive for amphetamine and methamphetamine. The Agency detained R. L. in protective custody in a foster home and filed a petition alleging inadequate care. (Welf. & Inst. Code, § 300, subd. (b).)

Cynthia admitted she had a 15-year history of methamphetamine use. She blamed her positive test on secondhand exposure to methamphetamine, explaining that all the people with whom she lived in Tijuana, B.C., Mexico, smoked methamphetamine. She later admitted using methamphetamine during her pregnancy with R. L. Cynthia had some clothing for the baby but lacked other supplies, including a car seat. She had no income. Cynthia said her home in Tijuana was not a safe place for the baby, and she would never take her there. She hoped to find a place to live in the San Diego area. Cynthia said her relatives in Tijuana were drug users, but she had other relatives in California and Mexico.

Cynthia alleged Gerardo L. was R. L.'s father. Gerardo was a Mexican national who lived in Tijuana with his aunt (Aunt). Cynthia provided Aunt's telephone number to the social worker, who telephoned Aunt. Aunt said she would contact Gerardo and ask him to telephone the social worker. The social worker did not hear from Gerardo.

4

Cynthia said Gerardo sometimes came to her house in Tijuana, and gave her address to the social worker. The social worker mailed notice of the dependency proceedings to Gerardo at Cynthia's address, "1972 Ancatilado Dorardo."

At the September 5, 2014, detention hearing, the juvenile court found that R. L. had only lived in California and thus California was R. L.'s home state under sections 3402, subdivision (g) and 3421. The juvenile court did not contact a court in Mexico.

In an interview with a social worker on September 11, 2014, Cynthia said she traveled between Las Vegas, Nevada and Tijuana, B.C., Mexico, for almost three years to care for her grandmother, who passed away in February 2014. Thereafter she lived in her uncle's house in Tijuana for almost seven months. In mid-August, Cynthia went to her mother's home in Las Vegas, Nevada, hoping to give birth there. While in Las Vegas, Cynthia had a prenatal visit and an ultrasound. She had not received any prenatal care in Mexico. Cynthia returned to Tijuana before the baby was born.

Cynthia told the social worker she had not had any contact with Gerardo since R. L.'s birth and was unable to locate him. On September 22, the social worker submitted parent search and international liaison search requests to locate Gerardo. On October 15, the social worker telephoned Aunt to inquire about Gerardo's whereabouts. Aunt said she had not seen Gerardo for several months and did not know where he was. The Agency's International Liaison Office could not locate Gerardo through the Mexican civil registry because it did not have Gerardo's place of birth. The Agency sent a request to the Mexican Consulate to search the civil registry, but the Consulate was unable to locate Gerardo's records.

At the jurisdictional and dispositional hearing on October 28, 2014, the juvenile court sustained the Welfare and Institutions Code section 300 petition, removed R. L. from her mother's custody and placed her in foster care, and ordered a plan of reunification services for Cynthia. The court found that the Agency made reasonable efforts to locate and provide notice to the alleged father.

After that hearing, the Agency continued its efforts to locate Gerardo. On November 12, 2014, the International Liaison sent a request to the Mexican social services agency (DIF) in Tijuana asking them to conduct a home visit and to publish a media announcement if they could not locate Gerardo. A DIF social worker went to Cynthia's address. There, she spoke to a man who told her Gerardo lived with his family in a pink house down the street. The social worker then went to the pink house, which was Aunt's home. Aunt said Gerardo was addicted to crystal methamphetamine and she had directed him to leave her home. He did not work and did whatever he wanted to do. Gerardo stayed in the same house with Cynthia and other drug addicts. On various occasions, Cynthia told Aunt that Gerardo was not R. L.'s father, and she had named him as the father to receive social services benefits.

On January 8, 2015, the Agency received a media announcement confirmation from DIF. Gerardo did not respond to the media announcement.

In reports prepared for the six-month review hearing, the Agency recommended the juvenile court terminate Cynthia's reunification services and set a hearing to select and implement a permanency plan under Welfare and Institutions Code section 366.26. Cynthia did not make any attempt to participate in services and the Agency was unable to

6

locate Gerardo. The Agency filed a declaration of due diligence describing its efforts to locate Gerardo in the U.S. and Mexico.

At the six-month review hearing on May 20, 2015, the juvenile court found that reasonable efforts were made to locate and notify Gerardo of the proceedings. The court also found that Cynthia had failed to contact and visit R. L. for six months, terminated reunification services, and set a Welfare and Institutions Code section 366.26 hearing.

In August 2015, the social worker received two letters from Cynthia stating she was in federal custody in San Diego. Cynthia was detained by U.S. authorities in May for crossing the international border with drugs. After learning that Cynthia was incarcerated in San Diego, the Agency facilitated visits between Cynthia and R. L. Cynthia remained behind a plexiglass partition while she watched R. L. play. Cynthia also tried to talk to R. L. by telephone.

In August, the Agency learned that Gerardo had been incarcerated in prison in Baja California since March 2015. On August 19, Gerardo was personally served with notice the Agency was recommending termination of parental rights and adoption, and a hearing was scheduled for September 15. Gerardo signed the notice acknowledging personal receipt of the notice of hearing and waived his right to 45-day notice of the hearing date.

On September 25 and 29, 2015, Gerardo left messages on the social worker's voicemail requesting a paternity test and a court-appointed attorney. At a hearing on October 8, the juvenile court appointed an attorney for Gerardo. Minor's counsel asked the court to order Gerardo to undergo a paternity test. On October 16, Gerardo left

7

another message with the social worker requesting a paternity test and asking the Agency to place R. L. with his cousin. At a later hearing, the court asked Cynthia whether she objected to the request for a paternity test. Cynthia replied, "He sure waited a long time to try to be a dad, you know." She said she wished Gerardo would have been more involved during her pregnancy.

At a hearing on October 28, 2015, after speaking with Gerardo, his attorney entered a general denial and said he would be objecting to the juvenile court's prior notice findings. The attorney said he read the petition to Gerardo and was able to briefly discuss the case with him. The record shows that Gerardo did not challenge the notice findings in juvenile court. The court continued the Welfare and Institutions Code section 366.26 hearing several times to receive paternity test results. The results showed the probability of Gerardo's paternity of R. L. was 99.99 percent.

The Welfare and Institutions Code section 366.26 hearing was held on January 13, 2016. The juvenile court found that Gerardo was R. L.'s biological father. The Agency reported that R. L. was a happy baby. She had some developmental delays but was receiving appropriate services. R. L.'s caregivers had cared for her since she was two days old and were willing to adopt her.

Cynthia and Gerardo did not present affirmative evidence and did not cross-examine the social worker. Cynthia said she expected to be released from federal custody on condition she not return to Mexico for three years.

The juvenile court found that R. L. was adoptable and terminated parental rights. The court designated R. L.'s foster parents as her prospective adoptive parents.

8

## DISCUSSION

## I

## THE UCCJEA

## A

### *The Parties' Contentions*

Gerardo contends the juvenile court erred in asserting home state jurisdiction under section 3421, subdivision (a)(1). He contends R. L. is the child of two Mexican residents, she had minimal contacts in California and, because of the Agency's intervention, R. L. was prevented from returning to Mexico. He argues the juvenile court should have assumed emergency jurisdiction and contacted Mexico, which was the child's home state under section 3421, subdivision (a)(2).

The Agency argues the juvenile court correctly determined California was R. L.'s home state under section 3421, subdivision (a)(1) because she was born in California, lived in California with a person acting as a parent since birth, and was less than six months old at the time the determination was made. The Agency contends it has a right to legal custody of R. L. under its emergency powers and is therefore a "[p]erson acting as a parent." (§ 3402, subd. (m).) Alternatively, the Agency contends jurisdiction was proper under section 3421, subdivision (a)(2) because Mexico is not R. L.'s home state, R. L. and Cynthia have a significant connection with California other than mere physical presence, and substantial evidence is available in California concerning R. L.'s welfare.

9

B

*Home State Jurisdiction*

1.      *Applicable Legal Principles and Standard of Review*

The UCCJEA "is the exclusive method of determining the proper forum in custody disputes involving other jurisdictions and governs juvenile dependency proceedings." (*C.T., supra,* 100 Cal.App.4th at p. 106.)  The UCCJEA is designed to avoid jurisdictional conflicts between states and relitigation of custody decisions, promote cooperation between states, and facilitate enforcement of another state's custody decrees.  (*In re Gloria A.* (2013) 213 Cal.App.4th 476, 482.)  Foreign countries are treated as states for the purpose of determining jurisdiction.  (§ 3405, subd. (a).)

"Subject matter jurisdiction either exists or does not exist at the time the action is commenced and cannot be conferred by stipulation, consent, waiver or estoppel." (*In re A.M.* (2014) 224 Cal.App.4th 593, 598.)  We are not bound by the juvenile court's findings regarding subject matter jurisdiction but independently reweigh the jurisdictional facts.  (*In re A.C.* (2005) 130 Cal.App.4th 854, 860.)

A state court has jurisdiction to make an initial custody determination, except as otherwise provided in section 3424, which governs temporary emergency jurisdiction, only if any of the following are true:

"(1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state.

10

"(2) A court of another state does not have jurisdiction under paragraph (1), or a court of the home state of the child has declined to exercise jurisdiction on the grounds that this state is the more appropriate forum under Section 3427 or 3428, and both of the following are true: [¶] (A) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence. [¶] (B) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships.

"(3) All courts having jurisdiction under paragraph (1) or (2) have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under Section 3427 or 3428.

"(4) No court of any other state would have jurisdiction under the criteria specified in paragraph (1), (2), or (3)."  (§ 3421, subd. (a).)

2.      *California does not have jurisdiction under section 3421, subdivision (a)(1):*
        *A temporary hospital stay in a state incident to birth, by itself, is insufficient to*
        *confer home state jurisdiction*

The juvenile court found that California was R. L.'s home state under section 3421, subdivision (a)(1) because she was less than six months of age, and had lived in California from birth with a parent or person acting as a parent.  (§ 3402, subd. (g).)  The Agency contends the juvenile court correctly applied the law.  Relying on out-of-state cases, Gerardo argues a temporary hospital stay incident to birth does not confer home state jurisdiction.  (*In re D.S.* (Ill. 2d 2005) 840 N.E.2d 1216 (*D.S.*); *In re R.P.* (Mo.Ct.App. 1998) 966 S.W.2d 292 (*R.P.*).)

11

The UCCJEA defines "home state" as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding.  In the case of a child less than six months of age, the term means the state in which the child lived from birth with [a parent or person acting as a parent].  A period of temporary absence of any of the mentioned persons is part of the period."  (§ 3402, subd. (g).)

"Person acting as a parent" is "a person, other than a parent, who: (1) has physical custody of the child or has had physical custody for a period of six consecutive months, including any temporary absence, within one year immediately before the commencement of a child custody proceeding; and (2) has been awarded legal custody by a court or claims a right to legal custody under the law of this state."  (§ 3402, subd. (m).) "Physical custody" means the physical care and supervision of a child.  (§ 3402, subd. (n).)

The issue whether the phrase "lived from birth with a parent or a person acting as a parent" includes a temporary hospital stay incident to birth is a matter of statutory interpretation, which we review de novo.  (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562.)  "The rules governing statutory construction are well settled.  We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent.  [Citations.]  'In determining intent, we look first to the language of the statute, giving effect to its "plain meaning." ' "  (*Id*. at p. 562.)  "If there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs."  (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.)

12

"If the statute's language is ambiguous, we examine additional sources of information to determine the Legislature's intent in drafting the statute." (*Olson v. Automobile Club of Southern California* (2008) 42 Cal.4th 1142, 1147.)

In applying and construing the UCCJEA, we give consideration "to the need to promote uniformity of the law with respect to its subject matter among states that enact it." (§ 3461.) State courts that have considered the phrase "lived from birth" have found it ambiguous. (*H.T. v. Cleburne County Dep't of Human Res.* (Ala.Ct.Civ.App. 2014) 163 So.3d 1054, 1064; *D.S.*, *supra*, 840 N.E.2d at p. 1222 [the verb "to live" has different meanings depending on context].) Although no California court has yet interpreted "lived from birth with a parent," other state courts have determined that the phrase " ' "requires more than the mother and newborn child staying at the same hospital for a brief period." ' " (*D.S.*, *supra*, 840 N.E.2d at p. 1221, quoting *R.P., supra,* 966 S.W.2d at p. 300; *In re Adoption of Baby Girl B.* (Kan.Ct.App. 1994) 867 P.2d 1074, 1079.)

In *R.P.*, the mother of the child lived in Missouri and was involved in dependency proceedings for her other children. The mother went to Kansas to give birth to R.P. The reviewing court held that Kansas did not have home state jurisdiction because R.P. did not live with her parents during her two-day hospital stay. (*R.P.*, *supra*, 966 S.W.2d at pp. 294, 300.)

In *D.S.*, the child's mother lived in Illinois. Her eight other children were not in her care. Afraid that child protective services would take custody of her baby, the mother made plans to move to Tennessee. When her doctor told her it was time to go to the hospital, she left for Tennessee. En route and in labor, the mother checked herself into a

13

hospital in Indiana, where she gave birth to D.S. After learning of D.S.'s birth, Illinois child protective services filed a dependency petition, which the trial court sustained. (*D.S.*, *supra*, 840 N.E.2d at pp. 1218-1219.) The mother appealed, arguing the Illinois trial court lacked subject matter jurisdiction. (*Id.* at p. 1219.)

The Illinois Supreme Court rejected respondent's suggestion the term " 'live' " means simply " 'to be alive,' " and held that the phrase " 'lived from birth' " meant something akin " 'to occupy a home.' " (*D.S.*, *supra*, 840 N.E.2d at p. 1222.) Relying in part on *R.P.*, the Illinois Supreme Court held that "[b]y itself, a temporary hospital stay incident to delivery is simply insufficient to confer 'home state' jurisdiction under the UCCJEA." (*Ibid.*)

The UCCJEA defines "home state" as where the child "lived from birth *with [a parent or a person acting as a parent*.]" (§ 3402, subd. (g) [italics added].) The record shows that R. L. did not live with Cynthia in California. Although Cynthia told the social worker she would like to stay in the San Diego area, a parent's subjective intent to change residence does not determine where the child "lived from birth." (*Ocegueda v. Perreira* (2015) 232 Cal.App.4th 1079, 1088.) Instead, the UCCJEA gives prominence to objective factors in determining jurisdiction. (*Ibid.*) To confer jurisdiction under section 3421, subdivision (a)(1), the evidence must establish that the child lived with a parent in the state in the sense they occupied a home together. (*D.S.*, *supra*, 840 N.E.2d at p. 1222.) Here, there is no showing that R. L. and a parent lived in California after her birth. Accordingly, we hold that a temporary hospital stay in a state incident to birth, by

itself, is insufficient to confer home state jurisdiction under section 3421, subdivision (a)(1).

We reject the Agency's argument California was R. L.'s home state because she lived with "a person acting as a parent" in California following birth. The Agency contends it had a right to legal custody of R. L. under its emergency powers and was therefore "a person acting as a parent." While the Agency may temporarily detain a child in protective custody, it has no right to legal custody unless it files a dependency petition under Welfare and Institutions Code section 300. The filing of the petition initiates the child custody proceeding. Under section 3421, subdivision (a)(1), the date of the commencement of the proceeding is determinative. A person claiming to be "acting as a parent" must have physical custody of the child or have had physical custody of the child for six months "within one year *immediately before* the commencement of a child custody proceeding." (§ 3402, subd. (m).) Thus, to the extent, R. L. was in the Agency's "physical care and supervision" (§ 3402, subd. (n)), the Agency did not have physical custody of her immediately before it initiated the dependency action. Accordingly, the juvenile court erred when it assumed home state jurisdiction under section 3421, subdivision (a)(1).

3.      *The juvenile court did not have significant connection jurisdiction*

The Agency argues jurisdiction was proper under section 3421, subdivision (a)(2) because R. L. and Cynthia have a significant connection with California other than mere physical presence, and substantial evidence is available in California concerning R. L.'s welfare. We are not persuaded.

15

To have jurisdiction under the significant connection provision, as relevant here, a court of another state must not have "home state" jurisdiction, and the child and the child's parents, or the child and at least one parent or a person acting as a parent, must have a significant connection with this state other than mere physical presence. (§ 3421, subd. (a)(2).) "[T]he court's inquiry is limited to the determination of whether it is in a better position than another court to decide the merits of the case and thus serve the best interest of the child." (*In re Marriage of Newsome* (1998) 68 Cal.App.4th 949, 959 [citing the UCCJA, the predecessor statute to the UCCJEA].)[2]

The first issue is whether the other state—Mexico—has home state jurisdiction under section 3421, subdivision (a)(1). Because R. L. never lived in Mexico, Mexico does not have home state jurisdiction. (*In re Marriage of Arnold & Cully* (1990) 222 Cal.App.3d 499, 502.) Thus, we assess the availability in each state of "[s]ubstantial evidence . . . concerning the child's care, protection, training, and personal relationships." (§ 3421, subd. (a)(2).) "There must be maximum rather than minimum contact with the state." (*Plas v. Superior Court* (1984) 155 Cal.App.3d 1008, 1016.)

In *In re Marriage of Arnold & Cully, supra,* 222 Cal.App.3d 499, a family court custody dispute involving actions in Canada and California, the reviewing court concluded that the two-year-old child had the requisite significant connection solely with

---

2    The UCCJEA eliminated the term "best interests" from the UCCJA in order to clearly distinguish between the jurisdictional standards and the substantive standards relating to custody and visitation. (National Conference of Commissioners on Uniform State Laws, Uniform Child Custody Jurisdiction and Enforcement Act (1997) Comment 2, pp. 25-26.)

Canada. Although the noncustodial parent resided in California and the child visited California, the child was born in Canada and had lived exclusively in Canada. Therefore, Canada had subject matter jurisdiction. (*Id*. at p. 501; *Haywood v. Superior Court* (2000) 77 Cal.App.4th 949, 955-956.)

In this case, the hearing on subject matter jurisdiction was held when R. L. was eight days old. She had never been to Mexico, and there was scant evidence in Mexico concerning her "care, protection, training, and personal relationships." (§ 3421, subd. (a)(2); see *In re Baby Boy M*. (2006) 141 Cal.App.4th 588, 600 [because newborn had been taken to another state, there was no substantial evidence in this state concerning his care, protection, training and personal relationships].) R. L.'s alleged father and paternal relatives lived in Mexico, but Gerardo did not express an interest in paternity until R. L. was more than a year old. His relatives were not willing to care for R. L. until paternity was established. They had reason to doubt Gerardo's paternity of R. L. By her own admission, Cynthia's stay in Mexico was tenuous. The Agency had relevant information about R. L., including her care, need for protection, relatives, medical condition, and relationship with her mother. Thus, there is substantial evidence in California concerning R. L.'s needs and well-being.

However, for the provision to apply, at least one parent must have a significant connection to California, other than mere physical presence. Although Cynthia purposefully sought medical care for herself and R. L. in California, she did not remain in the state. (See *In re S.W.* (2007) 148 Cal.App.4th 1501, 1510-1511 [subject matter jurisdiction appropriate where mother sought welfare in California and she and her

17

children were residing in the state when dependency proceedings began].)  The phrase "other than mere physical presence" in section 3421, subdivision (a)(2) assumes that a parent is present in the state.  Cynthia was not residing in California when the proceedings began and soon left for Mexico.  Although Cynthia was born in California and lived in the state for her first 14 years, her current circumstances are determinative for significant connection jurisdiction, not those that last existed 25 years earlier.  We therefore conclude that the juvenile court did not have subject matter jurisdiction under the significant connection provision of the UCCJEA.  (§ 3421, subd. (a)(2).)

C

*Emergency Jurisdiction*

At our request, the parties submitted additional briefing addressing the question: "To what extent does the juvenile court have temporary emergency jurisdiction under Family Code section 3424, subdivisions (a) and (b)?"

Cynthia concedes emergency jurisdiction would have been appropriate had the juvenile court held an evidentiary hearing on emergency jurisdiction.  She argues if the juvenile court had assumed emergency jurisdiction, it would not have had the authority to make a permanent custody order.

Gerardo contends the juvenile court should have asserted emergency jurisdiction and contacted Mexican authorities to transfer the case to Mexico.  He argues the juvenile court erred by assuming permanent jurisdiction without first contacting Mexico or providing a time-limited order giving the parties an opportunity to file a custody action in Mexico.

18

The Agency submits the juvenile court had temporary emergency jurisdiction based on its findings at the detention hearing. The Agency argues temporary jurisdiction continued and became a final custody determination because no other state had grounds for jurisdiction.

1.      *Legal Standards*

"Section 3424 provides an exception to the exclusive jurisdictional bases for making a child custody determination in California." (*In re A.M., supra,* 224 Cal.App.4th at p. 599.) "A court of this state has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to, or threatened with, mistreatment or abuse." (§ 3424, subd. (a).) In enacting section 3424, subdivision (a), the Legislature intended to expand the grounds on which a court may exercise temporary emergency jurisdiction. (§ 3424, subd. (e).)

Before a child custody determination is made under section 3424, notice and an opportunity to be heard must be given to all persons entitled to notice under the law of this state as in child custody proceedings. (§ 3425, subd. (a).) An evidentiary hearing, such as a detention hearing, that substantially complies with the essential procedural requirements of the UCCJEA is adequate to sustain temporary emergency jurisdiction. (*In re Cristian I.* (2014) 224 Cal.App.4th 1088, 1099 (*Cristian I.*).)

As relevant here, section 3424 states that "[i]f there is no previous child custody determination . . . and a child custody proceeding has not been commenced in a court of a state having jurisdiction under Sections 3421 to 3423, inclusive, a child custody

19

determination [made pursuant to temporary emergency jurisdiction] remains in effect until an order is obtained from a court of a state having jurisdiction under Sections 3421 to 3423, inclusive. If a child custody proceeding has not been or is not commenced in a court of a state having jurisdiction under Sections 3421 to 3423, inclusive, a child custody determination made under this section becomes a final determination, if it so provides and this state becomes the home state of the child." (§ 3424, subd. (b).)

A court of this state can properly exercise emergency jurisdiction under section 3424, but it is required to contact, and provide notice to, a court of the other state to determine whether the other state wishes to assert jurisdiction under section 3421 and commence proceedings to protect the child. (*A.M.*, *supra*, 224 Cal.App.4th at p. 598.) In addition, when a court of this state acting under temporary emergency jurisdiction is informed there is or has been a child custody proceeding in a court of a state having jurisdiction under section 3421, this court must immediately communicate with the other court. (§ 3424, subd. (d).) "Although the statute states the court *shall* immediately contact the other court, it does not provide any penalty for noncompliance. When a statute does not provide any consequence for noncompliance, the language should be considered directory rather than mandatory." (*C.T., supra,* 100 Cal.App.4th at p. 111.) Thus, even if the California court erred by not contacting the other court when it was required to do so, the error does not warrant reversal unless there is a showing of prejudice. (*Ibid.*)

Failure to comply with the procedural requirements of the UCCJEA is subject to harmless error analysis. (*Cristian I.*, *supra*, 224 Cal.App.4th at pp. 1102-1103.) Cynthia

and Gerardo must show it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (*People v. Watson, supra,* 46 Cal.2d at p. 836; *In re M.M.* (2014) 240 Cal.App.4th 703, 717-718 [harmless error test set forth in *Watson* applies to UCCJEA procedural error].)

D

*Analysis*

At the detention hearing, the juvenile court found that R. L.'s removal from Cynthia's care was required because there was a substantial danger to the physical health of the child, and there were no reasonable means to protect her without removal from parental custody. This finding provides a sufficient basis for assumption of emergency jurisdiction, which requires a finding that the child is "subjected to, or threatened with, mistreatment or abuse." (§ 3424, subd. (a).) R. L. tested positive for methamphetamine at birth, her mother had a long history of substance abuse and was staying in a house with other drug users. This substantiated allegation is sufficient to invoke emergency jurisdiction. (Cf. *C.T., supra,* 100 Cal.App.4th at pp. 107-108 [unsubstantiated allegations are insufficient to invoke emergency jurisdiction].) To the extent Cynthia now argues she did not receive " ' "a full and fair evidentiary hearing" ' " (*id.* at p. 107), the record shows she had notice and an opportunity to be heard, and the Agency had made reasonable efforts to locate Gerardo, without success. At the detention hearing, Cynthia did not contest the finding there was a substantial danger to R. L.'s health in her care.

21

We next consider whether the juvenile court was required to contact a court in Mexico. At the time of the detention hearing, there was no previous child custody determination and a child custody proceeding had not been commenced in a state having jurisdiction under section 3421. (§ 3424, subd. (b).) During R. L.'s dependency proceedings, the juvenile court was not informed that a child custody proceeding was commenced in Mexico. (§ 3424, subd. (d).) Notwithstanding the lack of a previous custody order or new child custody proceeding in Mexico that would require the court to contact the other court pursuant to emergency jurisdiction, this court has stated the preferred practice is to contact Mexican authorities to determine whether Mexico would assert jurisdiction and commence proceedings to protect the child. (*A.M.*, *supra*, 224 Cal.App.4th at p. 598.)

In *A.M.*, the parents and the children had lived in Mexico for at least six months, and Mexico clearly was the children's home state. (*A.M.*, *supra*, 224 Cal.App.4th at p. 596.) Our court concluded that the juvenile court had erred by failing to contact a Mexico court to determine whether Mexico would assert jurisdiction under section 3421. However, because the juvenile court had emergency jurisdiction, the error was harmless. (*Id.* at p. 598.) We affirmed the jurisdictional and dispositional orders, and conditionally remanded the matter for the limited purpose of contacting the Mexican authorities to determine whether Mexico wished to assume jurisdiction. (*Id.* at p. 599.)

Here, too, the juvenile court had emergency jurisdiction under section 3424. Unlike *A.M.*, Mexico does not have home state jurisdiction because R. L. never lived in Mexico. (§ 3421, subd. (a)(1).) As we have discussed, there is not substantial evidence

22

in Mexico about R. L.'s care, protection and training. (§ 3421, subd. (a)(2).) Cynthia traveled back and forth between Tijuana and Las Vegas for three years. When she was in Tijuana, she stayed with other drug users in a relative's home. The record does not establish that Cynthia had been living in Mexico for six months. Cynthia did not have medical care in Tijuana, a job, income, or any other indicator that Mexico was her home. She left Mexico twice in the month before R. L.'s birth to seek medical care in the United States. Cynthia applied for medical insurance when she was approximately six months pregnant, and was informed the insurance would be in effect when her baby was born. The record supports the reasonable inference Cynthia applied for medical coverage in Nevada or California, not Mexico; otherwise she would not have returned in anticipation of giving birth in those states. Unlike the father in *A.M.*, Gerardo did not acknowledge R. L. until she was more than a year old. Gerardo did not file any action in Mexico. Cynthia did not engage in reunification services. She made little effort to visit her daughter until she was incarcerated in San Diego. By the time of the Welfare and Institutions Code section 366.26 hearing, Cynthia had been residing in California for more than six months, and was prohibited from entering Mexico for three years. Thus, Cynthia and Gerardo do not show they were prejudiced by the juvenile court's failure to contact Mexican authorities. (*C.T.*, *supra*, 100 Cal.App.4th at p. 111.)

Here, because the juvenile court had temporary emergency jurisdiction and no child custody action was filed in Mexico, and Cynthia and Gerardo cannot show that Mexico would have jurisdiction under section 3421, subdivision (a), the juvenile court's

23

child custody determination becomes a final determination and California becomes R. L.'s home state. (§ 3424, subd. (b).)

## II

## THE HAGUE SERVICE CONVENTION

Gerardo contends the Agency failed to follow the Hague Service Convention in notifying him of the dependency proceedings and did not exercise due diligence in searching for him. He asserts his court-appointed attorney was not authorized to enter a general appearance for him. Gerardo argues the jurisdictional, dispositional, and all subsequent orders should be vacated for failure to comply with the Hague Service Convention.

## A

### *Applicable Legal Principles*

1. *Standard Notice Requirements in Dependency Actions*

Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." (*Mullane v. Cent. Hanover Bank & Trust Co.* (1950) 339 U.S. 306, 314; *In re Claudia S*. (2005) 131 Cal.App.4th 236, 247.) "Notice is both a constitutional and statutory imperative. In juvenile dependency proceedings, due process requires parents be given notice that is reasonably calculated to advise them an action is pending and afford them an opportunity to defend." (*In re Jasmine G.* (2005) 127 Cal.App.4th 1109, 1114.)

When a Welfare and Institutions Code section 300 petition is filed, the clerk of the juvenile court is required to issue notice by attaching a copy of the petition and causing it to be served on the parents. (Welf. & Inst. Code, § 291.) The parents are also entitled to receive notice of the Welfare and Institutions Code section 366.26 hearing at least 45 days before the hearing date. (Welf. & Inst. Code, § 294.) Unless there is no attempt to serve notice on a parent, in which case the error is reversible per se, notice errors do not automatically require reversal but are reviewed to determine whether the error is harmless beyond a reasonable doubt. (*In re J.H.* (2007) 158 Cal.App.4th 174, 183.)

2.      *The Hague Service Convention*

Where a parent is a resident of another country that is a signatory to the Hague Service Convention, the petition and notice of jurisdiction and disposition hearings must be served on the parent pursuant to the Convention's requirements. (*In re Jennifer O.* (2010) 184 Cal.App.4th 539, 547.) The Hague Service Convention applies when the forum state's internal law requires transmittal of documents as a necessary part of service of process. (*Volkswagenwerk Aktiengesellschaft v. Schlunk* (1988) 486 U.S. 694, 700 (*Volkswagenwerk*).) In juvenile dependency actions, the juvenile court is required to serve the Welfare and Institutions Code section 300 petition on the parents. (Welf. & Inst. Code, §§ 290.2, 291.)

The Hague Service Convention requires each state to establish a central authority to receive requests for service of documents from other countries. (*Volkswagenwerk*, *supra*, 486 U.S. at pp. 698-699.) In addition to service through a central authority, the Hague Service Convention permits service directly through its diplomatic or consular

25

agents, or by mail, unless a state objects. (3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 1005, pp. 1222-1223.) Mexico has objected to the use of those channels for service on its own citizens. Service on a Mexican citizen resident can only be accomplished through the Mexican Central Authority. (*In re Vanessa Q.* (2010) 187 Cal.App.4th 128, 134-135 (*Vanessa Q.*).)

When the Hague Service Convention applies to a parent, the failure to properly serve that parent "renders all subsequent proceedings void as to that person." (*In re Alyssa F.* (2003) 112 Cal.App.4th 846, 852.) Defective service of the petition and notice to appear is not cured by actual notice of the action. "Nonetheless, defective service is not fatal to personal jurisdiction if the defendant consents to jurisdiction over him or her by making a general appearance in the action." (*Vanessa Q.*, *supra*, 187 Cal.App.4th at p. 135; *Alyssa F.*, at p. 852; *Floveyor Internat., Ltd. v. Superior Court* (1997) 59 Cal.App.4th 789, 794.)[3]

The Hague Service Convention does not apply where the address of the person to be served is not known. (Convention, art. 1; *Lebel v. Mai* (2012) 210 Cal.App.4th 1154, 1161 (*Lebel*).) A plaintiff is required to exercise reasonable diligence to ascertain a defendant's whereabouts. (*Lebel*, at pp. 1161-1162; see also *David B. v. Superior Court* (1994) 21 Cal.App.4th 1010, 1016 [reasonable diligence denotes a thorough, systematic

---

[3] For this reason, where the Hague Service Convention applies, the better practice is, in addition to complying with the Convention, to attempt notice to the parent through other means, such as mail or through a relative and by notifying the Mexican Consulate. We would expect that, in the majority of dependency cases, a parent who is concerned about his or her child's well-being will want to promptly appear and participate in his or her child's dependency proceeding.

investigation and an inquiry conducted in good faith].) "No bright-line rule or singular test can be articulated identifying or quantifying what good faith efforts would amount to a proper showing of reasonable diligence" in locating a defendant for purposes of service in compliance with the Hague Service Convention. (*Lebel,* at p. 1162.) A determination of reasonable diligence is "a factual inquiry appropriately left to resolution in the trial court." (*Ibid.*)

The burden is on the plaintiff to show that service of process on the defendant comported with the Hague Convention, or why the Hague Convention did not apply. (*Lebel, supra,* 210 Cal.App.4th at p. 1160.)

B

*Analysis*

The claim the Agency did not make diligent efforts to locate Gerardo is meritless. When the Agency detained R. L. in protective custody in August, the social worker inquired about Gerardo's whereabouts. Cynthia gave the social worker the phone number for Aunt. The social worker immediately telephoned Aunt, who said she would go to Gerardo's workplace and tell him to telephone the social worker. The social worker did not hear from Gerardo. In September, shortly before the jurisdictional hearing, the Agency submitted a search request to DIF, the social services agency in Tijuana, B.C. DIF reported that it searched the civil registry and could not locate Gerardo. In October, the Agency sent a request to the Mexican Consulate. It did not have a record of Gerardo. The social worker telephoned Aunt, who said she had not seen Gerardo for several months and did not know his whereabouts. In December, a DIF social worker went in

27

person to Cynthia's address and then to Aunt's home in an effort to locate Gerardo. In January, DIF confirmed it had published a media announcement in an effort to locate Gerardo. Gerardo did not respond.

The record clearly shows that the Agency conducted a reasonable search to locate Gerardo and the inquiry was made in good faith. The Hague Service Convention does not apply where the address of the person to be served is not known and the plaintiff has exercised reasonable diligence to ascertain that person's whereabouts. (*Lebel*, *supra*, 210 Cal.App.4th at pp. 1161-1162.) Therefore, we reject Gerardo's claim that the orders from the jurisdictional, dispositional and review hearings must be vacated.

Prior to the Welfare and Institutions Code section 366.26 hearing, the Agency learned that Gerardo was incarcerated in Mexico. He was personally served in prison with a copy of the petition and the notice for the Welfare and Institutions Code section 366.26 hearing. However, the Agency did not effect service through the Mexican Central Authority, and thus failed to comply with the service requirements of the Hague Service Convention. Accordingly, Gerardo is correct that the service of process for the Welfare and Institutions Code section 366.26 hearing was defective. (*Vanessa Q.*, *supra*, 187 Cal.App.4th at p. 134.)

"Defective service of the petition and citation to appear is not cured by [Gerardo's] actual notice of the action." (*Vanessa Q.*, *supra*, 187 Cal.App.4th at p. 135.) "Nonetheless, defective service is not fatal to personal jurisdiction if the defendant consents to jurisdiction over him or her by making a general appearance in the action."

28

(*Ibid.*)  "A general appearance occurs when the defendant takes part in the action and 'in some manner recognizes the authority of the court to proceed.' "  (*Ibid.*)

Here, Gerardo made a general appearance in the action on October 28, when his counsel requested a continuance to obtain paternity test results.  (*Vanessa Q.*, *supra*, 187 Cal.App.4th at p. 135; see *Zobel v. Zobel* (1907) 151 Cal. 98, 101-102 [request for continuance constitutes general appearance because the relief could only be asked on theory that defendant was submitting to general jurisdiction of court]; see also *Knoff v. City & County of San Francisco* (1969) 1 Cal.App.3d 184, 201 [attorney's request for continuance of action constituted general appearance].)

It is a well-established principle that a general appearance constitutes consent to the court's personal jurisdiction regardless of any prior defect in notice.  (*Vanessa Q.*, *supra*, 187 Cal.App.4th at p. 136.)  There is nothing in the record to support Gerardo's assertion his court-appointed attorney was not authorized to enter a general appearance for him.  The record shows that Gerardo contacted the social worker, requested a paternity test, and asked for a court-appointed attorney.  His attorney represented he had read the petition to Gerardo and discussed the case, entered a general denial, and obtained a continuance of the Welfare and Institutions Code section 366.26 proceedings.  Gerardo submitted to the court order for a paternity test.  Although his attorney indicated Gerardo would challenge personal jurisdiction, he did not in fact do so.  Therefore, we reject Gerardo's claim he did not make a general appearance in the action.  The Agency has met its burden to show why the Hague Convention did not apply.  (*Lebel*, *supra*, 210 Cal.App.4th at p. 1160.)

DISPOSITION

The orders terminating parental rights are affirmed.

                                                 HALLER, J.

WE CONCUR:

BENKE, Acting P. J.

O'ROURKE, J.