ROBINSON, J., concurring.
¶ 37. Without explicitly saying so, the majority essentially holds as a matter of law that a child born in a hospital generally does not have a home state until he or she sleeps in a bed outside the hospital. Its analysis in support of this conclusion leaps from an uncontroversial legal assertion supported by the language of the statute and the cases the majority cites to the far more questionable holding that I challenge. I don't believe this analysis is supported by a sensible interpretation of the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) or the cases relied upon by the majority, and the majority's approach has negative real-world ramifications. I agree with the outcome of the majority's analysis not because, as a matter of law, a child in the hospital has no home state, but because in this case the evidence supports the trial court's conclusion that, on account of his mother's lack of an established home at the time of his birth, this newborn child had no home state. For these reasons, I concur in the judgment, but not in the majority's analysis of the jurisdictional question.[8]
¶ 38. The majority's holding rests on the partly explicit, partly implicit conclusion that a newborn child in the hospital has no home state. The majority concludes that, because this child was born in a hospital in New Hampshire, Vermont cannot be the child's home state as a matter of law, ante, ¶15, apparently even if the child has two parents who live together in Vermont, have lived together in Vermont for years, and plan to bring the child home to the newly decorated nursery in their home in Vermont that has been awaiting that child's arrival. In deciding that the child has no home state at all, the majority also concludes that New Hampshire is not the child's home state. It rests this conclusion in part on authority supporting the proposition that the child's birth in a New Hampshire hospital is not in itself enough to confer home state jurisdiction on New Hampshire. Ante, ¶14. But the Court goes further. In determining that New Hampshire is not the child's home state, the Court implicitly concludes that evidence about mother's living situation in the months leading up to the child's birth and mother's intent regarding where she and the baby would live after the child's birth, are not legally relevant. See ante, ¶13. Without explanation, the Court concludes that even though the child was born in New Hampshire, New Hampshire cannot be the child's home state even if mother had a long-established home in New Hampshire to which she planned to return with the child.[9] Because the child is a *1139 newborn, and still in the hospital, the majority implicitly reasons, he has no home state.[10]
¶ 39. The unremarkable proposition underlying the majority's analysis is that under the UCCJEA courts should look at where a child has actually lived, rather than where a parent asserts an intent to reside, in determining a child's home state. This statement of law is squarely supported by the language of the UCCJEA. See 15 V.S.A. § 1061(7) (defining "home state" as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding" and, for a child less than six months of age, as "the state in which the child lived from birth with any of the persons mentioned" (emphasis added)).
¶ 40. And this is the critical holding in the vast majority of cases cited by the majority in support of its analysis. See, e.g., Ocegueda v. Perreira, 232 Cal.App.4th 1079, 181 Cal.Rptr.3d 845, 856-57 (2015) (holding that where pregnant mother who lived and worked in California traveled to Hawaii to give birth, and then lived with child in Hawaii for six weeks, Hawaii, and not California, was child's home state); Slay v. Calhoun, 332 Ga.App. 335, 772 S.E.2d 425, 429-30 (2015) (holding that, where child traveled back and forth between mother's home in Florida and unadjudicated Georgia father's homes during six month period preceding father's parentage action, Georgia was child's home state because child spent more time in Georgia during that time); Powell v. Stover, 165 S.W.3d 322, 326 (Tex. 2005) (holding that where mother and father moved from Texas to Tennessee with child for period of ten months, and then mother returned to Texas with child and initiated custody action, mother's asserted subjective intent to return to Texas all along did not make Texas child's home state because child had actually lived in Tennessee for preceding ten months); In re Marriage of Miller & Sumpter, 196 S.W.3d 683, 691-92 (Mo. Ct. App. 2006) (holding that under predecessor Uniform Child Custody and Jurisdiction Act, where children lived in Virginia for well over six months preceding initiation of custody proceeding, Virginia was their home state notwithstanding fact that mother, who was in the military, listed Missouri as her permanent residence and intended to retire there), abrogated on other grounds by Hightower v. Myers, 304 S.W.3d 727, 733 (Mo. 2010) (en banc). I do not dispute this aspect of the majority's analysis. If this were a case in which a parent was arguing that a state had home state jurisdiction due to a parent's subjective intentions, even though the parent and child had not actually lived in that state, these cases would be apt and persuasive.
¶ 41. These decisions do not support the majority's suggestion that an infant in the hospital does not actually "live" anywhere. In distinguishing where a child lives from a parent's claimed legal residence based on that parent's intent, these courts emphasized the child's physical presence in a state, as contrasted with a parent's intentions as to the child's domicile, as the touchstone for determining a child's home state. See, e.g., Ocegueda, 181 Cal.Rptr.3d at 851 (concluding that child's "physical *1140 presence in Hawaii from birth until the day before commencement of the proceedings means the child 'lived' in Hawaii for purposes of determining home state jurisdiction under the UCCJEA" (emphasis added)); Powell, 165 S.W.3d at 328 ("[I]n determining where a child lived for purposes of establishing home-state jurisdiction, the trial court must consider the child's physical presence in a state." (emphasis added)). However, these cases all involved circumstances in which a child had lived in-was physically present in-a state outside of the hospital beyond the period incident to the birth. None purport to address the status of a newborn in a hospital moments after birth. In relying on the "physical presence" language in these decisions to conclude that a newborn child in the hospital has no home state as a matter of law, without regard to the evidence concerning the child's parents' living situation, the majority stretches the language in these cases far beyond their actual holdings.
¶ 42. This more controversial prong of the majority's analysis-in which the majority holds that this child had no home state upon initiation of this custody action because the newborn child was in the hospital and thus did not "live" in Vermont or New Hampshire-is not supported by the language or purpose of the UCCJEA, nor the handful of decisions the majority cites that actually address this more challenging issue.
¶ 43. Nothing in the language of the UCCJEA supports the notion that a newborn child in a hospital does not "live" anywhere. The UCCJEA defines a child's home state with reference to where a child has "lived." 15 V.S.A. § 1061(7). In the context of the cases above, it makes sense to equate "living" with "physical presence," because those cases involve a parent invoking an intent to reside somewhere other than where the children have actually been spending their days and nights in order to claim an intended home state for the children. But the statute does not use the term "physical presence" and includes no language suggesting that a newborn child in a hospital does not live anywhere, even if the child has two parents who have for a long time lived together in a single state in a home to which they plan to bring their newborn child upon discharge from the hospital.
¶ 44. Nor does the purpose of the UCCJEA support such a reading. One of the main features of the UCCJEA relative to its predecessor, the UCCJA, is that it prioritizes "home state" jurisdiction above the alternate bases of jurisdiction for an initial custody determination. 15 V.S.A. § 1071. This was a deliberate change from the UCCJA, which authorized four independent bases for establishing jurisdiction without prioritizing among them. See U.L.A. Child Custody Jurisdiction and Enforcement Act § 201 cmt. (1997); see also Ward v. LaRue, 2016 VT 81, ¶ 17, 202 Vt. 499, 150 A.3d 631. The prioritization of home state jurisdiction in the UCCJEA aligns the UCCJEA with the enforcement provisions of the federal Parental Kidnapping Prevention Act (PKPA) and eliminates problems that arise when courts in different states simultaneously exercise jurisdiction in child custody cases. U.L.A. Child Custody Jurisdiction and Enforcement Act § 201 cmt. (1997); see also Powell, 165 S.W.3d at 325. By prioritizing home state jurisdiction, the UCCJEA reduces the number of potential disputes between competing jurisdictions. An interpretation that narrows the scope of home state jurisdiction, or makes it less predictable, has the opposite effect of increasing the possibility of jurisdictional disputes in competing jurisdictions. See Stephens v. Fourth Judicial Dist. Court, 2006 MT 21, ¶ 13, 331 Mont. 40, 128 P.3d 1026 (explaining *1141 that interpretation that had effect of narrowing home state jurisdiction "would increase the number of potentially conflicting jurisdictional disputes in competing jurisdictions"-a result that "conflicts with the UCCJEA's purpose"); Powell, 165 S.W.3d at 326 ("We believe that the UCCJEA should be construed in such a way as to strengthen rather than undermine the certainty that prioritizing home-state jurisdiction was intended to promote...."). An interpretation that would render home-state jurisdiction inapplicable during the brief period of time when a child born in the hospital remains in the hospital after birth would greatly diminish the certainty and clarity the UCCJEA seeks to promote.
¶ 45. The main case relied upon by the majority that addresses the status of newborn babies in the hospital expressly contradicts the majority's actual holding. In re D.S., 217 Ill.2d 306, 298 Ill.Dec. 781, 840 N.E.2d 1216 (2005). In In re D.S., a mother who resided in Illinois was driving to Tennessee, where the father lived, when she went into labor en route. She delivered at a hospital in Indiana. Illinois child protection officials initiated a custody proceeding involving the child in Illinois. The Illinois Supreme Court upheld the trial court's significant connection jurisdiction after concluding that the child had no home state. The court rejected mother's argument that the child's brief stay in an Indiana hospital vested Indiana with home state jurisdiction, explaining:
By itself, a temporary hospital stay incident to delivery is simply insufficient to confer "home state" jurisdiction under the UCCJEA. Again, the best indication of legislative intent is the statutory language, given its plain and ordinary meaning. Section 102(7) defines a newborn's home state as the state in which he or she has "lived from birth" with his or her parents. The crucial question, of course, is what did the drafters of the UCCJEA mean by "live," a verb that can mean many different things depending upon the context. Did they mean, as respondents seem to suggest, nothing more than "to be alive"? That, for purposes of the UCCJEA, a child "lives" in every jurisdiction in which he or she draws a breath? Or did they mean, as the case law teaches, something more like "to occupy a home"? We are convinced that they meant the latter. When people speak of where a mother and newborn baby "live," they do not speak of the maternity ward. Instead, they speak of the place to which the mother and baby return following discharge from the hospital. In many parts of Illinois, the mother's hospital of choice may be located in another city or even another state. Hoopeston mothers, we now know, may deliver in Champaign. Galena mothers may deliver in Dubuque. Yet no one would respond "a hospital in Champaign" or "a hospital in Dubuque" if asked where these mothers and babies live. Rather, they would respond "Hoopeston" or "Galena" because that is where these mothers and babies "live," as that term is commonly understood.
As importantly, allowing a temporary hospital stay to confer "home state" jurisdiction would undermine the public policy goals of the UCCJEA, which include ensuring that "a custody decree is rendered in that State which can best decide the case in the interest of the child." Consider, again, a Galena mother who chooses to deliver her baby in a Dubuque hospital. In addition to living in Illinois, this mother may work in Illinois, have a husband and other children in Illinois, pay taxes in Illinois, attend church in Illinois, and send her children to Illinois schools. Clearly, if the occasion arose, Illinois would be the state *1142 "which can best decide" a case involving the interest of this mother's children. Yet, if respondent is correct, and a mere hospital stay is sufficient to confer home state jurisdiction under the UCCJEA, Iowa would possess exclusive jurisdiction over this newborn, based solely on the location of the obstetrician's practice. Such formalism turns the UCCJEA on its head, conferring jurisdiction on a state with a de minimis interest in the child, to the exclusion of the only state that could conceivably be called the child's "home." We refuse to endorse this interpretation.
Id., 298 Ill.Dec. 781, 840 N.E.2d at 1222-23 (footnotes, citations, quotations, and alterations omitted). The court concluded that the child had no home state not merely because the child was still in the hospital at the time child protection workers initiated the proceedings in Illinois, but also because mother's own testimony established that she had no connection to Indiana and no intention of remaining there following the child's birth, and that "she [was] a longtime resident of Illinois who, fearful of losing custody of [the child], intended to move to Tennessee." Id., 298 Ill.Dec. 781, 840 N.E.2d at 1223. The In re D. S. court's analysis does not support the suggestion that a child born in the hospital has no home state, and fully supports the proposition that evidence concerning the parent or parent's living arrangement and intentions with respect to the child are highly relevant in determining the home state of a newborn child in the hospital.
¶ 46. Similarly, In re R.L., 4 Cal.App.5th 125, 208 Cal.Rptr.3d 523 (2016), does not support the position the majority has taken. In that case, the court considered a mother who had lived alternately in Tijuana, Mexico and Las Vegas, Nevada for the three years prior to the child's birth. She crossed into San Diego County for the purpose of giving birth to the child. Due to positive drug tests for herself and her child, child protection officials took the child into custody and asserted that California courts had jurisdiction to conduct an initial custody proceeding. The appeals court rejected this argument on the ground that, although the mother told the social worker she would like to stay in the San Diego area, "a parent's subjective intent to change residence does not determine where the child 'lived from birth.' " Id. at 534. The critical fact in this case was that the mother did not live in California prior to the child's birth, and the critical holding was that her subjective intent to begin living in the state following the child's birth was insufficient to create home state jurisdiction under those circumstances. The court's decision does not suggest that if mother had actually relocated to and lived in California prior to giving birth in that state, California still would not have home state jurisdiction.
¶ 47. To the extent it is relevant, In re Adoption of Baby Girl B., a case interpreting the UCCJA as opposed to UCCJEA, is likewise unhelpful to the majority's argument. 19 Kan.App.2d 283, 867 P.2d 1074 (Kan. Ct. App. 1994), superseded by statute, K.S.A. 59-2127, as recognized in In re Adoption of H.C.H., 297 Kan. 819, 304 P.3d 1271, 1280 (2013). In that case, biological parents who were expecting a child initially lived in Pennsylvania with their own respective parents. The young mother-to-be moved to Kansas in September 1992 to live with her uncle and attend high school. She was unable to attend high school right away due to a medical issue. The child was born a couple of weeks later in Kansas. The next day, proposed adoptive parents who resided in Michigan petitioned the Kansas court for adoption and termination of the legal parents' rights. The child returned with them to Michigan upon discharge from the hospital, and the mother *1143 returned to Pennsylvania to finish the school semester a few days later. She returned to Kansas at the end of the semester. The mother consented to the adoption but the father did not. At issue before the Court of Appeals of Kansas was whether Kansas had jurisdiction. Concluding that the UCCJA applied to adoption proceedings, the court concluded that Kansas was not the child's home state. The court reasoned:
The requirement that the child "live with" the mother from birth requires more than the mother and newborn child staying at the same hospital for a brief period. When considering a similar provision in the Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A (1988), the court in Rogers v. Platt, 641 F.Supp. 381, 386 (D.D.C. 1986), stated, "[T]o 'live with' someone requires a deliberate manifestation to share a common place with the person during a substantial period of the time involved. Since an infant cannot make such a manifestation, the Court must look to the mother in this situation." The court in Rogers went on to conclude that, where the mother never saw the child after birth, signed a release permitting the hospital to give other individuals temporary custody of the baby a few hours later, and left the hospital without the child, the court could not conclude the child lived with the mother from birth. Here, the record is insufficient to support a finding that the child lived with the mother in Kansas from birth. Kansas was not the child's home state when the adoption proceedings were commenced.
867 P.2d at 1079-80 (emphasis added). In considering whether Kansas was the child's home state, the court did not conclude that as a matter of law the child had no home state while still in the hospital. Instead, the court looked to the evidence concerning mother's own living situation and intentions with respect to the child. Id. at 1080.
¶ 48. For the above reasons, the proper interpretation of "lived with" in the definition of "home state" in the UCCJEA, as applied to a newborn child in the hospital, requires consideration of the mother's living situation and intentions at the time of the child's birth. Although a mother cannot intend her way out of an actual living situation-that is, she cannot confer home state jurisdiction on a state where she does not actually live by declaring an intention to begin living there prospectively-when a mother lives in a single state with no intention to relocate at the time of the child's birth, and plans to return to that home with the child upon discharge from the hospital, the mother and child live in that state from the moment the child is born, whether or not they are still in the hospital.
¶ 49. The issue here is not merely academic; the majority's approach broadly expands the number of states that may assert jurisdiction to adjudicate the custody of newborn children who, through their parents, other adults, or various circumstances, have potential ties of varying degrees to multiple states. If a newborn child in the hospital has no home state, then any state with a significant connection can assert jurisdiction to make an initial custody determination. See, e.g., 15 V.S.A. § 1071(a)(2) (providing that Vermont court may assert jurisdiction when no other court has jurisdiction if child and at least one parent has "significant connection with Vermont"). This is true whether the child is born in Vermont or New Hampshire, and whether the parents have an established residence in one state or the other. The significant connection required to support jurisdiction need not be the most significant or strongest connection.
*1144 Pierce v. Slate, 2017 VT 63, ¶ 23, --- Vt. ----, 172 A.3d 190. State child protection agencies from any state with a significant connection to a child and the child's parent may ask that state's courts to initiate a custody proceeding at the time of the child's birth. The court in the state where the first state agency files would maintain jurisdiction subject only to the court's discretion to decline to exercise jurisdiction in deference to another state. See 15 V.S.A. § 1076(a) (establishing first-in-time rule, where multiple states have jurisdiction); 15 V.S.A. § 1077 (providing that court with jurisdiction may decline to exercise jurisdiction).[11]
¶ 50. I agree with the outcome of the majority's analysis not on the basis of an across-the-board rule about newborns in the hospital, but because in this case the evidence supports the trial court's conclusion that, on account of mother's lack of an established home at the time of the child's birth, this newborn child had no home state. After an evidentiary hearing, the trial court found that in the late winter months of 2014, mother moved out of her trailer in Vermont, and the home became uninhabitable due to burst pipes. Through 2014 mother continued to give the address for that trailer to New Hampshire and Vermont social service providers. Mother was essentially homeless for several months in 2014, living with her own mother, at friends' houses, with her brother, with father at his parents' house in Vermont, and with relatives in New Hampshire. Mother lived with her grandparents in New Hampshire in December 2014, but that arrangement was short-lived. She was staying with her mother and her mother's cousins in a different New Hampshire town shortly before the child's January 12, 2015 birth. She testified that she intended to remain in New Hampshire for the foreseeable future, and acknowledged that she spends nights in some other locations at times, including with the father in his home in Vermont. These findings were supported by the evidence, and are unchallenged on appeal. They support the trial court's conclusion that mother was homeless, and had lived in multiple different residences over the several months prior to the child's birth. The court properly rejected mother's argument that her claimed subjective intent to stay in New Hampshire was sufficient to convey home state status on New Hampshire under such circumstances, especially when, as the court noted, "the evidence strongly suggests that she was trying to avoid the attention of Vermont DCF, so that [the child] would not be placed in Vermont custody." The trial court properly considered whether mother actually lived in New Hampshire or Vermont, at the time of the child's birth, and its conclusion that she did not supports its determination that the child has no home state under the UCCJEA. For these reasons, I concur in the court's judgment only.
TEACHOUT, Supr. J., Specially Assigned, dissenting in part.
¶ 51. I dissent only on the ruling that because father had the ability to participate in the last stage of the case, his due *1145 process rights were sufficiently protected. He was summoned into court as a named party in the petition, and as such he had the right to an opportunity to be heard as to his position on parentage at the temporary care hearing, which is a preliminary hearing on the petition. 33 V.S.A. § 5307(g). Instead he was summarily dismissed without an opportunity to even state a position or seek to have parentage established. The majority ruling seems to endorse the principle that a named party's due process right to a timely opportunity to be heard can be compromised as long as the person is brought into the case later. This ruling does not sufficiently protect the due process rights of fathers in future cases as well as this one, nor the rights of children to have an opportunity for a relationship with their father that is timely in terms of their developmental needs.
¶ 52. In a juvenile case, "all the parties involved are to be accorded a fair hearing, and their constitutional and other legal rights recognized and enforced." In re R.B., 152 Vt. 415, 421, 566 A.2d 1310, 1313 (1989) (quotation omitted). The due process right of a named party father to be heard in a timely way is too important to be subject to possible compromise. For some fathers, delay may mean denial of participation until too late, not only regarding hearings but also to be part of a case plan (due within sixty days of removal pursuant to 33 V.S.A. § 5314 ) and to participate in services to prepare for effective parenting.
¶ 53. The process by which father's parental rights were terminated was procedurally flawed when, as a named party, he was not given a timely opportunity to be heard on the petition. I would reverse as to father and remand for a new disposition case plan and hearing with respect to father. I concur on all other issues in the majority opinion.

I concur fully in the majority's analysis and judgment with respect to father's arguments concerning the trial court's failure to immediately order genetic testing of father and references to the New Hampshire termination of parental rights orders.

The logic of the majority's analysis is somewhat inconsistent. In rejecting Vermont as the child's home state, as a matter of law, the majority emphasizes the fact that the child was born in a New Hampshire hospital and has not been "physically present" in Vermont. Ante, ¶15. But in rejecting New Hampshire as the home state, the majority asserts that the child's physical presence in New Hampshire on account of being born in a New Hampshire hospital is irrelevant.

The majority suggests that some cases may exist in which a child in the hospital does "live with" a parent in that state, and thus has a home state. But its analysis clearly rests on the proposition that a child in the hospital "lives" in that hospital-a conclusion I reject for the reasons set forth below.

I don't see anything in the court's analysis that limits its holding to cases in which a child is born in a different state from where the parents live and plan to bring the child upon discharge from the hospital. If physical presence in the hospital does not confer jurisdiction, and the parents' own living arrangements and intentions are irrelevant, then no child in the hospital has a home state. Even if the holding were somehow limited to children born in states other than where the parents live, it would still have broad and harmful effects. For example, a large number of Vermonters up and down the Connecticut River Valley cross the river into New Hampshire for their medical care, including to give birth.