Filed 9/28/23 In re Joliene H. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re JOLIENE H., et. al., Persons Coming Under the Juvenile Court Law. | B326604 |
| _____ | (Los Angeles County |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Super. Ct. No. 21CCJP01954A-D) |
| Plaintiff and Respondent, | |
| v. | |
| TERRILL H. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephen C. Marpet, Juvenile Court Referee. Conditionally affirmed and remanded with directions.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant Terrill H.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant Jessica R.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and David Michael Miller, Deputy County Counsel for Plaintiff and Respondent.

————————————

Jessica R. (mother) and Terrill H. (father) separately appeal from an order terminating parental rights to their four children under Welfare and Institutions Code section 366.26.[1] Mother contends the court failed to comply with the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA, Fam. Code, § 3400 et seq.). Mother and father both argue the Los Angeles County Department of Children and Family Services (DCFS) conducted an inadequate inquiry to determine whether the children are or may be Indian children within the meaning of the Indian Child Welfare Act (ICWA) and related state law. We hold that the court impliedly found it had jurisdiction over this proceeding and substantial evidence supports that finding. However, we conclude the juvenile court prejudicially erred in finding that DCFS conducted proper and adequate inquiry, and that it exercised due diligence, in determining whether the children are or may be Indian children. DCFS was required to attempt to interview available maternal extended family members and it failed to do so. We conditionally affirm the juvenile court's order and remand for further proceedings.

---

[1]     All further undesignated statutory references are to the Welfare and Institutions Code.

2

# FACTUAL AND PROCEDURAL BACKGROUND

## *Overview of dependency proceedings*

The family consists of mother, father, Joliene H. (born December 2013), Paul H. (born November 2015), Leilani H. (born March 2017), and Joel H. (born June 2018).

The family came to DCFS's attention in April 2021, when it received a report that mother was on drugs, she had "socked" Joel in the stomach, and she left the children with strangers. On April 27, 2021, DCFS filed a petition under section 300, and the children were detained. In August 2021, the court sustained allegations in the petition that parents had a history of violent altercations, mother had a history of substance abuse and father failed to protect the children from it, mother left the children with a maternal uncle without an appropriate plan for their care, and father was unable to care for the children. The court ordered family reunification services for parents. Parents, however, failed to attend programs, to drug test, and to consistently visit the children, who were eventually placed together with a prospective adoptive parent. Parents' reunification services were terminated, and on January 24, 2023, the court terminated their parental rights, finding that the children were adoptable.

## *Proceedings and evidence related to the UCCJEA*

When DCFS received the report concerning the family in April 2021, a social worker investigated the allegations. Mother told the social worker that she had been in Los Angeles for two months, living with three of her children with a maternal cousin, while Joliene had been living with a maternal uncle for months. Previously, mother had been in Arizona where maternal grandmother and maternal aunt lived, although mother said she did not get along with them. Mother left Arizona because she

3

was unable to pay her rent.  Mother also said that she had been going from California to Arizona for the past three years and had lived in Arizona for only a few months, returning to Los Angeles when her family would not help her.

Maternal uncle reported that Joliene had been with him since she was a baby.  Maternal uncle's partner reported that mother and the children had lived on and off with them for the last few years.  Joliene was put in their care after mother and father were involved in a domestic violence incident at a motel in Montebello, California, where the family was living on November 9, 2019.  The police report from the incident stated that mother and father lived in Montebello and had California drivers' licenses.  In February 2020, mother took all four children to Arizona, but father then took Joliene, Paul, and Joel from mother in December 2020 and left them with a stranger in Pomona.  Joliene returned to maternal uncle's home in January 2021, where she remained until the dependency petition was filed.

Maternal grandmother told the social worker that mother and the children had lived in Arizona, but maternal grandmother had not spoken to mother since January or February 2021.

At the April 30, 2021 detention hearing, mother submitted a mailing address notification form identifying an address in Los Angeles.  At the detention hearing, the court noted the UCCJEA might apply because mother had previously resided in Arizona.  Mother was at the hearing and said she had lived her "whole life" in California.  However, she had moved to Mesa, Arizona around March 2019 and returned to California at the beginning of

4

November 2020.[2]  She denied having any open child welfare cases in Arizona or being investigated by social workers there.  Mother also said she had health insurance through LA Care.  The court ordered DCFS to reach out to its Arizona counterpart and to update the court in its next report.

DCFS did so, and its Arizona counterpart said the family had one "report" but no cases.  The report was from December 2019 and concerned the domestic violence incident between mother and father at the motel in Montebello, California.  It was believed that mother and three of her children were living with maternal aunt in Arizona, while Joliene remained in California with maternal uncle.  General neglect allegations were unsubstantiated, and the report was closed in February 2020.

Neither the court nor any party thereafter raised the UCCJEA in the proceedings below.

### ICWA Background

Mother reported that she was born in Los Angeles.  Although maternal grandmother raised her, mother and her three sisters were also in foster care for a time.  Mother explained that "[h]er parents divorced, she grew up too fast, and was traumatized," and "[s]he had to take care of her siblings and took the place of her parents."  Mother knew maternal grandfather's first name but did not know his full name and did not talk to

---

[2]  Mother and father had previously told the social worker that mother and the children returned to Los Angeles from Arizona in November or December 2020 and lived with father in a house in either Montebello or Pico Rivera, California.

5

him.[3] Mother told a social worker that she did not get along with her family and she believed maternal grandmother and maternal aunt made false reports about her to child protective services.

Father reported that he was born in Los Angeles, and paternal grandfather, whose name he refused to provide, raised him and his six siblings after his mother left them. Although father initially provided what he claimed was paternal grandmother's address as his mailing address, he later told a social worker he did not have any family members' contact information. The record does not indicate that DCFS ever obtained the names of any paternal relatives or that social workers had contact with any paternal relatives.

Mother and father submitted ICWA-020 forms denying Indian ancestry. At the detention hearing in April 2021, the court found it had no reason to believe the children were Indian children and did not order notice to any tribe. Parents, their counsel, and DCFS were ordered to inform the court of any new information relating to possible ICWA status.

## DISCUSSION

### I. The UCCJEA

For the first time, mother contends on appeal that the court failed to determine whether it had jurisdiction over this dependency proceeding under the UCCJEA, that because such jurisdiction is fundamental the order terminating parental rights is null and void, and that remand is necessary so that the court

---

[3] The record does, however, contain maternal grandfather's name, in connection with a child welfare referral from 2014. The referral indicated father, mother, and maternal grandfather were in the same house, and that maternal grandfather is a registered sex offender.

6

can conduct an evidentiary hearing.  DCFS responds that mother forfeited any issue under the UCCJEA by failing to object below, and in any event, substantial evidence supports the court's implied finding that California has jurisdiction over this matter.  As we now explain, we conclude the court considered whether it had jurisdiction under the UCCJEA and found it did.  Further, substantial evidence supports that jurisdictional finding.

California and Arizona have adopted the UCCJEA, an act applicable in dependency proceedings that is the exclusive method to decide the proper forum to adjudicate issues involving a child subject to a sister-state custody order.  (Fam. Code, § 3421, subd. (b); *In re Cristian I.* (2014) 224 Cal.App.4th 1088, 1096; *In re J.W.* (2020) 53 Cal.App.5th 347, 355 [every state except Mass. has enacted UCCJEA].)  The UCCJEA "is designed to avoid jurisdictional conflicts between states and relitigation of custody decisions, promote cooperation between states, and facilitate enforcement of another state's custody decrees."  (*In re R.L.* (2016) 4 Cal.App.5th 125, 136.)

The UCCJEA is codified in the Family Code.  (Fam. Code, § 3400 et seq.)  There are four ways in which a California court has jurisdiction.

First, California was the child's home state when the proceeding was commenced, or was the child's home state within six months before commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state.  (Fam. Code, § 3421, subd. (a)(1).)  "Home state" means the state in which a child lived with a parent for at least six consecutive months immediately before the beginning of the child custody proceeding.  (Fam. Code, § 3402,

7

subd. (g).) A period of temporary absence is part of the period. (*Ibid.*)

Second, another state's court does not have jurisdiction under the first ground, or declines to exercise jurisdiction, and the child or at least one parent acting as a parent has a significant connection to California other than mere physical presence and substantial evidence is available in California concerning the child's care, protection, training, and personal relationships. (Fam. Code, § 3421, subd. (a)(2).)

Third, all courts having jurisdiction under the first two grounds have declined to exercise jurisdiction because California is the more appropriate forum. (Fam. Code, § 3421, subd. (a)(3).)

Fourth, no other state would have jurisdiction under the first three grounds.[4] (Fam. Code, § 3421, subd. (a)(4).)

Whether the UCCJEA implicates a court's fundamental jurisdiction is unsettled. (Compare *In re J.W.*, *supra*, 53 Cal.App.5th at p. 367 ["UCCJEA does not govern fundamental jurisdiction," so father could not raise lack of UCCJEA jurisdiction for first time on appeal]; with *In re L.C.* (2023) 90 Cal.App.5th 728, 737–738 [declining to decide whether UCCJEA implicates fundamental jurisdiction but finding "*other* reasons why" forfeiture doctrine should not apply]; see also *In re Marriage of Kent* (2019) 35 Cal.App.5th 487, 491–492, 495–496 [stipulation to modify N.C. court's custody and support order was act in excess of jurisdiction under UCCJEA].)

---

[4]     The UCCJEA also permits courts to exercise temporary emergency jurisdiction under specified circumstances. (Fam. Code, § 3424, subd. (a).) Because we hold the court properly exercised jurisdiction, we need not decide whether it had temporary emergency jurisdiction.

If, as mother contends, the UCCJEA implicates a court's fundamental jurisdiction, then any issue regarding it cannot be forfeited and may be raised on appeal for the first time. (See generally *In re J.W.*, *supra*, 53 Cal.App.5th at p. 356.) We need not reach this contention, because the court here *did* consider the UCCJEA and impliedly found it had jurisdiction over the dependency proceedings. This case is therefore unlike *In re L.C.*, *supra*, 90 Cal.App.5th 728, which mother cites. In that case, the record did not indicate that DCFS or the juvenile court, despite knowing of the mother's recent out-of-state residence and prior Texas child welfare case, investigated that case or conducted a jurisdictional analysis. (*Id.* at p. 734.) In contrast, the court here raised the UCCJEA at the detention hearing, questioned mother about where she lived, obtained confirmation that mother had essentially lived her "whole life" in California and had been in California for the preceding six months, and ordered DCFS to follow up with its Arizona counterpart. DCFS complied with that order and reported that no dependency-related matter had been filed in Arizona. Although the court did not then expressly find it had jurisdiction, it impliedly did so, as it continued to assert jurisdiction over the family. (See *In re Cristian I.*, *supra*, 224 Cal.App.4th at p. 1098 [flawed proceeding nonetheless substantially complied with UCCJEA's procedural requirements and satisfied its goals].)

We therefore next consider whether substantial evidence supports the court's findings in determining jurisdiction.[5] (See,

---

[5] Some courts have independently reweighed jurisdictional facts when reviewing findings regarding subject matter jurisdiction. (See generally *In re Aiden L.* (2017) 16 Cal.App.5th

e.g., *A.M. v. Superior Court* (2021) 63 Cal.App.5th 343, 351; *In re Aiden L.*, *supra*, 16 Cal.App.5th at pp. 519–520.)  Under that standard of review, we resolve all conflicts in favor of the court's order and indulge reasonable inferences to uphold it.  (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981; *Schneer v. Llaurado* (2015) 242 Cal.App.4th 1276, 1286.)

Substantial evidence establishes that California is the children's home state under section 3421, subdivision (a)(1).  The proceeding was commenced on April 27, 2021, when the dependency petition was filed.  (See Fam. Code, § 3402, subd. (e).)  The detention hearing took place three days later, on April 30, 2021.  At the detention hearing, mother said she had been in California since "the beginning of November" 2020.  Therefore, the family was in California for the six months preceding the filing of the petition and the detention hearing in late April 2021, perhaps less a couple of days.

Substantial evidence also established that mother and the children were in California more than mother represented to the social worker.  She said they were in Arizona from March 2019 to November 2020.  However, mother, father, and the children were living in a motel in Montebello, California *in November 2019*, when the domestic violence incident occurred.  Also, the family was in California at some point in *February 2020*, because that is when maternal uncle's partner said mother took the children to Arizona.  Evidence also suggests that Joliene was not in Arizona with mother at all times.  That is, the Arizona social worker reported that only three children were with mother in Arizona in December 2019; Joliene was with maternal uncle in California.

508, 519–520.)  Even if that standard applied, the outcome here would be the same.

10

And maternal uncle and his partner confirmed that Joliene had lived with them for significant periods of her life. This evidence therefore shows that the family did not live in Arizona from March 2019 to November 2020 but resided in California during at least some of that time as well. Indeed, mother admitted that for the past three years she has travelled between California and Arizona and had lived in Arizona for only a few months. Thus the evidence supports a finding that any absence from California was merely temporary. (See Fam. Code, § 3402, subd. (g); see generally *In re Aiden L.*, *supra*, 16 Cal.App.5th at p. 518 ["temporary absence" requires considering parents' intentions and circumstances of departure from state they had resided].)

Otherwise, the evidence shows that the family has significant connections to California. (See Fam. Code, § 3421, subd. (a)(2).) Three of the four children were born in California; only Paul was born in Arizona in 2015. Mother and father had California drivers' licenses; mother had California health insurance; there is no evidence father has lived anywhere but California; mother told the court she had lived her "whole life" in California; and mother had extended family in California with whom she and the children at times lived.

In contrast, the record shows that the family has few significant connections to Arizona. There is no evidence father has ever lived or even visited Arizona. Although maternal grandmother and maternal aunt live there, maternal grandmother reported that mother no longer speaks to her. Mother has no stable housing in Arizona. Joliene would at times remain in California while mother and the other three children went to Arizona. And importantly, no custody proceedings involving these children were filed in Arizona. Therefore, to the

11

extent the UCCJEA's purpose to is avoid jurisdictional conflicts between states and relitigation of custody decisions (*In re R.L.*, *supra*, 4 Cal.App.5th at p. 136), it is unclear how transfer of the proceedings to Arizona would further that purpose, and mother does not explain how it would.

We therefore conclude that substantial evidence overwhelmingly supports the court's finding that California, not Arizona, has jurisdiction over the children.

## II.     ICWA

Mother and father denied Indian heritage when DCFS interviewed them and on their ICWA-020 forms.  On the basis of these denials, the court found it had no reason to know that the children were Indian children.  Parents did not challenge that finding below.  However, father, with mother joining, now contends the court and DCFS failed to comply with their duty of inquiry by failing to ask available maternal relatives about possible Indian ancestry.[6]

_____

[6]     Neither parent expressly argues on appeal that DCFS's ICWA inquiry was inadequate due to a failure to interview the children's extended family members from father's side of the family.  Father's briefing on appeal mentions only in passing that DCFS did not interview any paternal relatives, but argues remand is appropriate "because the Department's failure to make any inquiry of known maternal extended family members left the juvenile court without sufficient evidence upon which to find that the inquiry was proper, adequate, and duly diligent."  We note the record does not indicate any paternal relatives were available to be interviewed, and, further, father told social workers he had no contact information for any of his family.  (*In re Q.M.* (2022) 79 Cal.App.5th 1068, 1082 [agency cannot be expected to "intuit the names of unidentified family members or to interview

12

## A.     Duty of Inquiry

Section 224.2 sets forth the duties of a county welfare department and the juvenile court in determining whether a child is or may be an Indian child.  An " 'Indian child' " is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."  (25 U.S.C. § 1903(4); § 224.1, subd. (a).)

Section 224.2, subdivision (a), provides that both the court and the Department have an "affirmative and continuing duty" to inquire whether a child is or may be an Indian child, beginning with the "initial contact," which includes asking the party reporting abuse or neglect if they have any information that the child may be an Indian child.  Under section 224.2, subdivision (b), if a child is placed in the Department's temporary custody pursuant to section 306, the agency must inquire whether the child is or may be an Indian child, by asking a nonexclusive group that includes the child, the parents, and extended family members.[7]  An " 'extended family member' " is an adult who is the "Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew,

---

individuals for whom no contact information has been provided"].)  With respect to father's side of the family we find no error in the juvenile court's finding of adequate inquiry and due diligence.

[7]     Under section 224.2, subdivisions (d) and (e), additional inquiry or actions are required if there is reason to believe or reason to know the child is an Indian child.  This case concerns only the initial inquiry required under section 224.2, subdivision (b).

first or second cousin or stepparent," or an individual as otherwise defined by an Indian child's tribe. (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

Section 224.2, subdivision (i)(2), provides that if "the court makes a finding that proper and adequate further inquiry and due diligence as required in this section have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence." "On appeal, we review the juvenile court's ICWA findings for substantial evidence." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1051; *In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.)

## B. Applicability of section 224.2, subdivision (b) when the initial removal is pursuant to a protective custody warrant

As a preliminary matter, mother notes that several courts have recently found the section 224.2, subdivision (b) duty to include extended family members in the initial ICWA inquiry applies when there is a warrantless removal under section 306, but not when, as here, DCFS obtains a protective custody warrant pursuant to section 340 prior to removal. (See *In re Robert F.* (2023) 90 Cal.App.5th 492 (*Robert F.*), review granted July 26, 2023, S279743; *In re Ja.O.* (2023) 91 Cal.App.5th 672 (*Ja.O.*), review granted July 26, 2023, S280572; *In re Adrian L.* (2022) 86 Cal.App.5th 342, 353–374 (*Adrian L.*) (conc. opn. of Kelley, J.).) In its respondent's brief, DCFS acknowledges *Robert F.* but argues that irrespective of that court's reasoning, substantial evidence supports the juvenile court's ICWA finding in this case. There is currently a split of authority between the

14

Courts of Appeal on this issue and the question is pending before the California Supreme Court.[8]

---

[8] Section 306 provides, in relevant part: "(a) Any social worker in a county welfare department . . . may . . . [¶] (1) Receive and maintain, pending investigation, temporary custody of a child who is described in Section 300, and who has been delivered by a peace officer. [¶] (2) Take into and maintain temporary custody of, without a warrant, a child who has been declared a dependent child of the juvenile court under Section 300 or who the social worker has reasonable cause to believe is a person described in subdivision (b) or (g) of Section 300, and the social worker has reasonable cause to believe that the child has an immediate need for medical care or is in immediate danger of physical or sexual abuse or the physical environment poses an immediate threat to the child's health or safety. [¶] (b) Upon receiving temporary custody of a child, the county welfare department shall inquire pursuant to Section 224.2, whether the child is an Indian child."

Section 340 provides, in relevant part: "(b) A protective custody warrant may be issued without filing a petition under Section 300 if the court finds probable cause to support all of the following: [¶] (1) The child is a person described in Section 300. [¶] (2) There is a substantial danger to the safety or to the physical or emotional health of the child. [¶] (3) There are no reasonable means to protect the child's safety or physical health without removal.

"(c) Any child taken into protective custody pursuant to this section shall immediately be delivered to the social worker who shall investigate, pursuant to Section 309, the facts and circumstances of the child and the facts surrounding the child being taken into custody and attempt to maintain the child with the child's family through the provision of services.

"(d)(1) Nothing in this section is intended to limit any other circumstance that permits a magistrate to issue a warrant for a

15

Relying on the plain language of the statute, as well as legislative history, *Robert F.* and similar cases reason that section 306, subdivision (a)(1) allows a social worker to "[r]eceive and maintain" temporary custody of a child when a peace officer has removed the child without a warrant pursuant to preceding sections of the statute (§§ 305, 305.6), and subdivision (a)(2), by its express language, applies only when the social worker takes a child into temporary custody without a warrant.  (*Robert F.*, *supra*, 90 Cal.App.5th at pp. 500–501; *Ja.O.*, *supra*, 91 Cal.App.5th at pp. 678, 680.)  Neither provision references children taken into temporary custody by means of a protective custody warrant pursuant to section 340, and the threshold for issuing such a warrant differs from the showing necessary for a warrantless removal.  The *Robert F.* line of cases thus interprets section 224.2, subdivision (b)'s reference to temporary custody pursuant to section 306 as a deliberate legislative choice to create a broader duty of inquiry only in a narrow set of circumstances.  (*Robert F.*, at pp. 501, 503, citing *Adrian L.*, *supra*, 86 Cal.App.5th at pp. 353–374 (conc. opn. of Kelley, J.); *Ja.O.*, at p. 681.)  They therefore conclude that, absent a warrantless removal pursuant to section 306, subdivision (a), a child welfare agency need only ask extended family members whether a child is an Indian child as part of an initial inquiry if there are case-specific circumstances that make such an inquiry necessary, such as a family member volunteering that the family has Indian ancestry.  (*Robert F.*, at p. 504.)

---

person.  [¶]  (2) Nothing in this section is intended to limit a social worker from taking into and maintaining temporary custody of a minor pursuant to paragraph (2) of subdivision (a) of Section 306."

16

Recently, however, the court in *In re Delila D.* (2023) 93 Cal.App.5th 953, review granted September 27, 2023, S281447 (*Delila D.*) disagreed.[9] We find *Delila D.* persuasive. The *Delila D.* court concluded section 224.2, subdivision (b)'s reference to temporary custody under section 306 includes children "who, though initially removed by protective custody warrant, are then delivered or placed into the department's custody pending a detention hearing." (*Id.* at p. 973.) The court reasoned that "[w]hen a child is removed by warrant, the taking is authorized by section 340, and the holding or maintaining in custody is authorized by section 306, subdivision (a)(1). That is, section 340 provides that when a child is taken from home by means of a warrant, the child must be 'delivered to' the social worker . . . . Section 306, subdivision (a)(1), in turn, authorizes the social worker to 'receive' the child and 'maintain' them in temporary custody." (*Id.* at p. 971.)

The court in *Delila D.*, *supra*, 93 Cal.App.5th 953, further noted that section 224.2, subdivision (b) applies if a child is " 'placed into the temporary custody of a county welfare department pursuant to section 306 . . . .' " (*Id.* at p. 966.) The court reasoned this "word choice indicates the Legislature

---

[9]     Three additional courts have considered this issue, two in opinions that are not yet final. *In re Andres R.* (2023) 94 Cal.App.5th 828 (*Andres R.*), is a direct response to, and rejection of, *Delila D.* A concurring opinion by the author of *Delila D.* agrees with the result in *Andres R.*, but disagrees with the rejection of the *Delila D.* analysis. *In re V.C.* (Sept. 6, 2023, A166527) __ Cal.App.5th __ [2023 WL 5734521] and *In re Jerry R.* (Sept. 11, 2023, F085850) __ Cal.App.5th __ [2023 WL 5843770], agree in whole or in part with *Delila D.*, and reject the reasoning of the *Robert F.* line of cases.

intended to cover children initially taken into custody by a police officer (under § 305, 305.6, or 340) then delivered or *placed* into the department's temporary custody under section 306, subdivision (a)(1). There is no practical difference between children taken by warrant and those taken without a warrant, and so there is no reason to distinguish between them for ICWA inquiry purposes." (*Id.* at p. 972.)

We find this analysis supported by section 306, subdivision (b), which was added by Assembly Bill No. 3176 (2017–2018 Reg. Sess.) (A.B. 3176). The subdivision provides: "Upon receiving temporary custody of a child, the county welfare department shall inquire pursuant to Section 224.2, whether the child is an Indian child." Consistent with the *Delila D.* court's interpretation of sections 306 and 340 as providing that once a protective custody warrant is executed, law enforcement places the removed child into the department's temporary custody, the inquiry provision of subdivision (b) applies without regard to how the county welfare department has *received* temporary custody of the child.

The *Delila D.* court additionally considered California Rules of Court, rule 5.481, which requires social workers to complete the section 224.2, subdivision (b) inquiry any time the child welfare department is seeking a foster care placement. "Where, as here, the rule is not inconsistent with the statute, we are required to follow it." (*Delila D.*, *supra*, 93 Cal.App.5th at p. 975.)[10] We are further persuaded by the *Delila D.* court's

---

[10] The *Andres R.* court disapproved California Rules of Court, rule 5.481 as inconsistent with legislative intent to the extent it requires a child welfare agency to conduct the section 224.2,

reasoning that "it simply doesn't make sense to apply different initial inquiries depending on how the child was initially removed from home, as that procedural happenstance has nothing to do with a child's ancestry." (*Ibid*.)

Whether initiated by a protective custody warrant or warrantless action by peace officer or social worker, once the initial removal occurs, the child welfare agency's other obligations are the same. Under section 340, subdivision (c), any child taken into protective custody pursuant to a warrant "shall immediately be delivered to the social worker," who then must investigate the "facts and circumstances of the child and the facts surrounding the child being taken into custody," pursuant to section 309, just as if the child was removed without a warrant pursuant to section 306.[11] The statute does not distinguish between children in the agency's custody pending a detention hearing following a warrantless removal and children in the agency's custody pending a detention hearing following the execution of a protective custody warrant. (See e.g., § 319.) As the *Delila D.* court recognized, "because the department, not law

subdivision (b) inquiry outside of warrantless removal cases. (*Andres R.*, *supra*, 94 Cal.App.5th at p. 854.)

[11] We agree with the concurring opinion in *Andres R.*, that viewing section 306, subdivision (a)(1) as encompassing a child taken into custody under section 340 and delivered to the social worker does not render section 340, subdivision (c) surplusage. Instead, "the language and historical context of section 340 demonstrate that the reference to section 309 . . . functions as a necessary cross-reference to the temporary custody and detention provisions in article 7" of the Welfare and Institutions Code. (*Andres R.*, *supra*, 94 Cal.App.5th at p. 862, (conc. opn. of Slough, J.).)

19

enforcement, is charged with conducting the ICWA investigation in a dependency proceeding, it simply makes more sense that section 224.2(b) would tie the initial inquiry to when the child is *delivered* to the department under section 306, subdivision (a)(1) and not when they are *initially taken* from home under section 340. We therefore conclude that section 224.2(b)'s reference to temporary custody 'pursuant to [s]ection 306' is better read as including children who, though initially removed by protective custody warrant, are then delivered or placed into the department's custody pending a detention hearing." (*Delila D.*, *supra*, 93 Cal.App.5th at pp. 972–973.)[12]

---

[12] The *Robert F.* cases and *Delila D.* all reviewed the legislative history of A.B. 3176 and relevant federal guidelines, but the courts drew disparate conclusions. The courts in *Robert F.*, *Ja.O.*, and the concurring opinion in *Adrian L.*, concluded the legislative history and federal guidelines support a narrow application of section 224.2, subdivision (b) to only those cases where the "social worker is acting without court authorization." (*Robert F.*, *supra*, 90 Cal.App.5th at p. 502.) In addition to examining earlier versions of the language eventually enacted as section 224.2, subdivision (b), these cases assert the statute echoes a 2016 Bureau of Indian Affairs guideline recommending that the State agency ask extended family whether a child is "Tribal member" as part of the " 'emergency removal and placement process,' " and not suggesting "that such inquiry is required in any other circumstance." (*Adrian L.*, *supra*, 86 Cal.App.5th at p. 362 (conc. opn. of Kelley, J.), citing U.S. Dept. of the Interior, Guidelines for Implementing the Indian Child Welfare Act (Dec. 2016) p. 28.) The *Delila D.* court concluded history relating to the origination of A.B. 3176, the "obvious purpose of Assembly Bill 3176 . . . to expand the scope of the initial inquiry beyond the parents," and an analysis of the term

Several courts have understood the initial inquiry requirements added by A.B. 3176, including the need to inquire of extended family members, as reflecting the imperative that effort be expended at an early stage to identify Indian children, and, further, that a broad inquiry may be necessary to identify Indian children in light of the history of forced assimilation and abusive child welfare practices that separated many Indian children from their families and tribes. (See e.g., *In re S.S.* (2023) 90 Cal.App.5th 694, 705–711 [detailing "long and troubling" history of separation of Indian children from their families and tribes and forced assimilation; asking relatives about Indian ancestry can be "a vital link connecting Indian children with their tribes, which helps preserve a future for cultures the Legislature sought to protect"]; *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1002 (*Ezequiel G.*) [ICWA's procedural and substantive safeguards require that adequate ICWA inquiry is done "at the earliest possible stage of a proceeding"]; *In re T.G.* (2020) 58 Cal.App.5th 275, 287, 295 [imposition of duty to inquire broader than duty to provide ICWA notice "is premised on the commonsense understanding that, over time, Indian families, particularly those living in major urban centers like Los Angeles, may well have lost the ability to convey accurate information regarding their tribal status"].)

_____

"emergency removal" as relating to the juvenile court's order detaining a child at the detention hearing rather than the social worker's act of taking the child from the parents' home, all leave "no rational justification for interpreting section 224.2(b)'s reference to section 306 as excluding children removed by warrant." (*Delila D.*, *supra*, 93 Cal.App.5th at pp. 973, 974.)

This is consistent with other changes to the law effected by A.B. 3176, such as the higher standard a court must apply to detain an Indian child at the detention hearing (§ 319, subd.(d)). We agree with the concurring justice in *Andres R.*, that "[t]he need to determine whether a child who may be detained at the initial petition hearing is an Indian child or falls under a tribe's exclusive jurisdiction is as urgent for children removed by warrant as it is for children removed under exigent circumstances." (*Andres R.*, *supra*, 94 Cal.App.5th at p. 863, (conc. opn. of Slough, J.).)  We further agree with the *Delila D.* court that the "interpretation of section 224.2(b) as ' "crafting [a] narrow inquiry duty" ' that applies only to children initially taken into temporary custody without a warrant contravenes the plain language and obvious purpose of Assembly Bill 3176." (*Delila D.*, *supra*, 93 Cal.App.5th at p. 975, citing *Robert F.*, *supra*, 90 Cal.App.5th at p. 503.)  We thus conclude section 224.2, subdivision (b) applied in this case.

### C. DCFS inquiry was inadequate and prejudicial

It is undisputed that DCFS did not interview any extended family members to determine whether the children are or may be Indian children.  In *Ezequiel G.*, a majority of a panel of this court concluded that under some circumstances, a juvenile court may properly find the agency has conducted an adequate inquiry to determine whether a child is or may be an Indian child, even if it does not interview any extended family members.  The *Ezequiel G.* court explained that the focus of the juvenile court's analysis is not on the number of individuals interviewed, but on whether the agency's ICWA inquiry has yielded reliable information about a child's possible tribal affiliation.  (*Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 1009.)  The *Ezequiel G.* court also concluded the

juvenile court's determination of whether there is reason to know a child is an Indian child is reviewed for substantial evidence, but the juvenile court's finding under section 224.2, subdivision (i)(2) as to whether a " 'proper and adequate further inquiry and due diligence as required in this section have been conducted,' " is reviewed for an abuse of discretion. (*Id*. at p. 1004.)

Other courts have concluded a juvenile court's "no ICWA" finding is necessarily unsupported by substantial evidence if the agency failed to interview available extended family members, but they have adopted several divergent standards for determining whether that failure is prejudicial error requiring reversal. These standards range from automatic reversal (*In re H.V.* (2022) 75 Cal.App.5th 433, 438; *In re Y.W.* (2021) 70 Cal.App.5th 542, 556), to presumptive affirmance (*In re A.C.* (2021) 65 Cal.App.5th 1060, 1065), with variations in between, including the test set forth in *In re Dezi C*. (2022) 79 Cal.App.5th 769, 779, review granted Sept. 21, 2022, S275578 (*Dezi C.*).

The *Dezi C.* court, for example, concluded the proper application of our state's test for harmless error in the ICWA inquiry context is that "an agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding." (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 779.) The proper standard for assessing prejudicial error in ICWA inquiry cases is also an issue pending before the California Supreme Court.

We need not discuss the divergent standards in detail here. Excepting the presumptive affirmance approach, we conclude

that application of any of the other various tests employed by our fellow appellate courts mandates a remand for further proceedings in this case.[13]

During DCFS's initial investigation, mother told a social worker she was in foster care as a child, she took care of her siblings, she did not get along with her family, and she was suspicious of maternal grandmother and a maternal aunt because she believed they had contacted child welfare services and made false reports. Maternal grandmother said mother was not speaking with her. Mother also claimed to not know maternal grandfather's full name and she did not speak to him.[14]

---

[13] We decline to follow the presumptive affirmance approach adopted by some courts, which finds no basis for reversal unless a parent shows that, if asked, he or she would have claimed to have Indian ancestry. (See *In re A.C.*, *supra*, 65 Cal.App.5th at pp. 1065, 1069.) As the court explained in *Dezi C.*, "by focusing on what a parent proffers on appeal," the presumptive affirmance approach "ignores that the juvenile court record may provide a reason to believe that the juvenile court's ICWA finding is incorrect and that further inquiry is warranted. Where, for instance, a parent is never asked about his or her American Indian heritage or the parent's answer is of less value because the parent is adopted, the presumptive affirmance rule would mandate affirmance in the absence of a proffer, even though, in our view, there is on those facts reason to believe the child may be an Indian child." (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 785.)

[14] We also note that at the outset of the investigation, mother was actively using methamphetamines. Social workers repeatedly reported that mother cried during initial interviews, and she denied being addicted to drugs even after admitting that she had used methamphetamines only days earlier. At one point

Mother's history as a dependent child, her indication that her parents abandoned their parental role for at least some period when she was a child, and her estrangement from her family all cast significant doubt on the reliability of her reporting when asked whether the children are or may be Indian children. There is reason to believe her reporting regarding Indian ancestry may not have been fully informed. (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 779.) Yet, DCFS was in contact with several maternal family members, including maternal grandmother who, presumably, would be likely to possess information helpful to determine whether mother is a member of an Indian tribe, and whether the children are or may be Indian children. (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 744 [reversal necessary "where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child"].)

Under these circumstances, substantial evidence did not support the juvenile court finding that DCFS conducted an adequate inquiry and exercised due diligence by interviewing only mother to determine whether the children are or may be Indian children through mother's family, and we are unable to find the error harmless. We therefore conditionally affirm the juvenile court order, remanding the matter for further inquiry and compliance with ICWA.

---

a social worker "was unable to determine whether mother was having withdrawal symptoms, or whether the mother was having a mental health crisis due to her behavior of crying excessively." The only interview DCFS conducted with mother related to ICWA occurred during this initial period.

## DISPOSITION

The juvenile court's order terminating parental rights is conditionally affirmed.  The case is remanded to the juvenile court to order DCFS to immediately comply with the inquiry provisions of Welfare and Institutions Code section 224.2 as to available extended maternal family members.  After ensuring DCFS has complied with the inquiry, and, if applicable, notice provisions of ICWA and related California law, the juvenile court shall determine whether ICWA applies.  If the court determines ICWA does not apply, the order terminating parental rights shall remain in effect.  If the court determines ICWA does apply, it shall vacate its order terminating parental rights and proceed consistent with ICWA and related state law.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

I concur:

LAVIN, J.

26

EDMON, J., Concurring and Dissenting:

I agree that the juvenile court properly took jurisdiction over the dependency proceedings under the Uniform Child Custody Jurisdiction and Enforcement Act.

However, for the reasons I set forth in *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, I disagree that the juvenile court's finding under the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.), that the children were not Indian children, must be reversed. Rather, father and mother denied Indian ancestry. Notably, neither mother nor father contends that remand is necessary for further inquiry of any paternal extended relatives. (Maj. opn., at p. 12, fn. 6.) And while mother has a troubled relationship with maternal grandmother and was in foster care for a time, maternal grandmother nonetheless raised mother. Mother was also in Arizona because that was where maternal grandmother and other maternal relatives lived, suggesting that any estrangement between mother and her maternal relatives was not lifelong. Nor can any conclusion or inference be drawn from mother's methamphetamine use and her ability to be an accurate reporter about her Indian ancestry. (Maj, opn., at p. 25, fn. 14.)

I would therefore affirm the order terminating parental rights.

Because I would affirm the order, I need not reach whether the Welfare and Institutions Code section 224.2, subdivision (b), duty to include extended family members in the initial ICWA inquiry applies only when there is a warrantless removal under Welfare and Institutions Code section 306 and not when removal is pursuant to a protective custody warrant under Welfare and Institutions Code section 340. (Compare *In re Robert F.* (2023) 90 Cal.App.5th 492, rev. granted July 26, 2023, S279743, with *In re Delila D.* (2023) 93 Cal.App.5th 953, rev. granted Sept. 27, 2023, S281447.)

EDMON, P. J.

1