Filed 11/25/25  In re Z.G. CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re Z.G. and S.G., Persons Coming Under the Juvenile Court Law. | 2d Juv. No. B345003 (Conso. w/B345755) (Super. Ct. Nos. 22JV00328, 22JV00437) (Santa Barbara County) |
| SANTA BARBARA COUNTY CHILD PROTECTIVE SERVICES, Petitioner and Respondent, v. D.G., Objector and Appellant. | |

D.G., (Mother) is the biological mother of a daughter, S.G., born in August, 2013, and a son, Z.G., born in August,

2016.[1]  She appeals orders of the juvenile court denying her requests to reinstate family reunification services with regard to both children (Welf. & Inst. Code, § 388)[2] and vacating the order terminating her parental rights to Z.G.  (§ 366.26.)  She contends the juvenile court did not have subject matter jurisdiction over the children because it did not comply with the Uniform Child Custody Jurisdiction and Enforcement Act.  (UCCJEA; Fam. Code, § 3400 et seq.)  She further contends the juvenile court erred when it denied her section 388 requests on the ground that she had not demonstrated changed circumstances or that the resumption of reunification services would be in the best interests of the children.

 Respondent correctly concedes that the juvenile court failed to comply with the UCCJEA because it did not inquire whether Washington state has jurisdiction over the children.  We conditionally reverse the orders terminating family reunification services for both children and terminating Mother's parental rights to Z.G. and remand the matter to permit the juvenile court to determine whether it has jurisdiction under the UCCJEA.  If the court on remand determines that it has jurisdiction over the children under the UCCJEA, the orders are to be reinstated.  The orders denying Mother's section 388 requests to change court orders are affirmed.

---

[1] D.G. is also the biological mother of W.K., a son born in October, 2008.  W.K. is not at issue in this appeal.

[2] All statutory references are to the Welfare & Institutions Code unless otherwise stated.

2

*Facts*

In mid-October 2022, respondent learned that three unsupervised children had spent hours at a Santa Barbara skateboard park. W.K., then almost 14 years old, was not watching the others; Z.G., the youngest, had wet himself. Although the children had luggage with them, Z.G. had no clean clothes to change into. All of the children were wearing dirty clothes and appeared unbathed. They had no cell phone or other means of contacting Mother, although W.K. and S.G. could describe how to walk to her workplace. When Mother returned to the skate park, she did not appear concerned about the situation, explaining that the younger children were in the care of W.K.

The family had no place to stay. A child welfare worker got them a motel room for the night and made an appointment with Mother for the next morning. The child welfare worker explained that the Department might be able to offer Mother bus passes and hotel vouchers. Mother did not appear for the meeting.

The next day, a bystander reported to Santa Barbara police that a young child, Z.G., was unattended and wandering on State Street. He told police that he was waiting for Mother who had walked away from him. Police then found W.K. and S.G. at the skatepark. They reported that Mother was at work. When officers went to the workplace, however, they learned Mother was no longer employed there. She was later found, 28 blocks away, at the motel where the family last stayed. Mother told the police officer that her children walked away from her and she had been looking for them. She seemed "nonchalant" about the situation, telling the officer that she was on her way to the park to pick up the children. When she arrived, Mother told the police officers

3

that she believed she had done nothing wrong and that there was no reason to be upset or to charge her with anything.

Virtually the same situation occurred again the next day. Bystanders flagged down a Santa Barbara police officer to report they had found three unattended children. The children were unbathed and wearing the same dirty clothes they had been wearing the day before. Because they had not eaten, the bystanders, who worked at a restaurant, gave the children food and drinks while they waited for Mother to arrive. Mother appeared about 30 minutes later and was again unconcerned. A police officer noted that she "did not appear concerned for the wellbeing of her children while they were running around on the sidewalk and in/out of traffic." Respondent took the children into custody.

The children told child welfare workers that they had slept outside several times that week. S.G. said that she would hide money from Mother because otherwise Mother would take it and "go to the bar." W.K. explained that the family had been in Santa Barbara for about three weeks. They most recently lived in Long Beach and had no friends or family in the area. W.K. and S.G. were not familiar with the area and did not know how to contact Mother. Mother often left W.K. and S.G. alone without a cell phone. She did not leave Z.G. with them as often. W.K. explained that Mother drinks beer and sometimes gets "scary irrational." She talks and laughs to herself and "it sort of freaks [W.K.] out."

W.K. also explained that their maternal grandmother lived near Palm Springs. The family had moved around a lot in California and Washington state. They moved every few months and were not always in school. The family's last apartment was

4

in Seattle.  When they lived there, Mother "'went bonkers.'"  She was almost never home, but when she was there, "'she would be screaming about nothing, a lot of weird stuff, like she was on something.'"

Respondent's investigation into the family disclosed nine prior child welfare referrals from Washington state and California.  Washington state child welfare workers received complaints regarding the children in March, April and May 2022.  She refused to accept resource vouchers offered by Washington child welfare workers.  California referrals began in September 2022.  When Santa Barbara police issued Mother a citation for child neglect in October 2022, Mother provided a Washington state driver's license and stated her last address was in Long Beach, California.

Throughout the dependency proceedings, Mother insisted that the children had been removed illegally and were kidnapped.  Respondent referred Mother for counseling, mental health assessment and parenting classes.  She declined to attend.  Mother later refused treatment for what respondent described as her "significant mental health issues" and possible substance abuse.  Mother attended some supervised visits with S.G. and Z.G. but did not bring appropriate snacks or activities and had to be reminded not to discuss the dependency case with them.

The children were eventually placed with their maternal grandmother.  In March 2023, Mother was arrested for attempted kidnapping and burglary after she tried to break into the maternal grandmother's condominium.  After her arrest, Mother made delusional statements to the police indicating she was suffering from significant mental illness.  She remained in custody at a state hospital, where she received mental health

treatment, until August 2024.  Mother wrote letters to the children that included allegations they had been kidnapped by their grandmother, were in danger, and that Mother was in the FBI.  Her letters also included pictures of cartoon characters with drug paraphernalia.

Meanwhile, W.K. and S.G. remained placed with their maternal grandmother.  Z.G. moved to a resource home in Santa Barbara County after the maternal grandmother decided that she could no longer manage him.  All of the children improved in these settings.  The juvenile court terminated reunification services for Mother at the 12-month status review hearing in October 2023.

At the July 2024 selection and implementation hearing (§ 366.26), the court selected long term guardianship with the maternal grandmother as the permanent plan for S.G.  At the next hearing, in January 2025, Z.G. was doing well in a prospective adoptive home.  S.G. remained placed with her maternal grandmother. Respondent recommended that Mother's parental rights to Z.G. be terminated so that he could be freed for adoption.

Both cases were continued to February 6, 2025.  By that time, Mother had been released from the state hospital, completed residential substance abuse treatment and was living in a sober living home in Cathedral City, California.  She informed the court of her intention to file a request to change court order under section 388.  The court continued the hearings regarding the termination of Mother's parental rights to Z.G. and finalization of S.G.'s legal guardianship.

Mother filed separate section 388 requests to change court orders with respect to S.G. and Z.G. in which she asked the

court to reinstate reunification services for both children.  She argued that resuming services would be in the best interests of the children because, if she could find stable employment and housing, both of the children could live with her rather than be permanently separated as currently planned.

Mother explained that she had completed a residential rehabilitation program and was living in a sober living home.  She had completed classes in parenting, mental illness management and recovery, and anger management.  She had also participated in outpatient treatment, 12-step programs for alcohol and drugs, cognitive behavioral therapy and random drug testing.  She had been participating in supervised telephone visits with both S.G. and Z.G. since December 2024.

The trial court held a separate contested hearing for each child.  At the hearing regarding Z.G., the court considered both Mother's section 388 request and respondent's recommendation under section 366.26 that Mother's parental rights be terminated.  Mother testified that she had been living in a two-bedroom apartment for about one week and was currently working a combined 40 hours per week at Goodwill and McDonald's.  She spent three months in the residential treatment program where she attended numerous programs designed to help her achieve sobriety and prevent relapse.

Although Mother acknowledged that she is an alcoholic, she maintained that she "was a pretty moderate drinker."  The children knew that she drank alcohol, but "it was never an aspect to where, like, my kids ended up in an involved situation, no."  Mother also maintained that the officer who took her children into custody "didn't give me any allegations as to why he was removing them."  She no longer believed the children

had been kidnapped, but she did believe they were "illegally removed." Mother testified that she still does not "find a reason why they were [removed], no." She does did agree with the specific reasons for the removal that she was later given.

The trial court denied the section 388 petitions, concluding that Mother's circumstances were "changing, not changed." The treatment and classes Mother had participated in were "a good start, but it's not anything but a start." Resuming services was not in the children's best interests because Mother "still doesn't [know] why the kids were removed and/or disputes the reason [for] the kids' removal – which, to me, just simply indicates a lack of understanding as to why the kids are within the jurisdiction of the Court." Without that "foundational knowledge," the juvenile court could not find that Mother's circumstances had changed substantially. It also found that reinstating services would not be in Z.G.'s best interests given the additional delay that would be caused. The trial court then followed respondent's recommendations by terminating Mother's parental rights to Z.G. and selecting adoption as the permanent plan for him.

The hearing regarding S.G. was held 10 days later and the court reached the same result.

*Contentions*

Relying on evidence that the family lived in Washington state before arriving in California, Mother contends the juvenile court lacked subject matter jurisdiction over the children because it did not comply with the Uniform Child Custody Jurisdiction and Enforcement Act. (UCCJEA; Fam. Code, § 3400 et seq.) Mother further contends the trial court erred when it denied her section 388 requests because her

8

circumstances had changed and it would be in the best interests of the children for them to be with her and with each other.

*Standard of Review*

Because the question is one of law, we review de novo whether the juvenile court violated the UCCJEA or properly exercised subject matter jurisdiction in this matter. (*In re J.W.* (2020) 53 Cal.App.5th 347, 355.) We review the court's decision to deny Mother's section 388 petitions for abuse of discretion. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416.)

*Discussion*

The UCCJEA. The UCCJEA, codified at Family Code, sections 3400, et seq., "is the exclusive method in California to determine the proper forum in child custody proceedings involving other jurisdictions." (*In re Jaheim B.* (2008) 169 Cal.App.4th 1343, 1348.) Dependency actions are subject to the UCCJEA. (*Ibid.*) The statute is "designed to avoid jurisdictional conflicts between states and relitigation of custody decisions, promote cooperation between states, and facilitate enforcement of another state's custody decrees." (*In re R.L.* (2016) 4 Cal.App.5th 125, 136.)

California courts have temporary emergency jurisdiction over any child present in this state who "has been abandoned or . . . is subjected to, or threatened with, mistreatment or abuse . . . ." (Fam. Code, § 3424, subd. (a).) As relevant here, California has non-emergency jurisdiction to make child custody determinations where California is the child's "home state," or where another state qualifies as the home state but declines to exercise jurisdiction on the ground that California is a more appropriate forum, the child and at least one parent are present in California and substantial evidence relevant to the

custody determination is also present in California.  (Fam. Code, § 3421, subds. (a)(1), (a)(2).)

A child's "'[h]ome state,'" is "the state in which a child lived with a parent . . . for at least six consecutive months immediately before the commencement of a child custody proceeding."  (Fam. Code, § 3402, subd. (g).)  A period of temporary absence from the home state by the child or parent is part of the six-month period.  (*Ibid.*; see also *In re Aiden L.* (2017) 16 Cal.App.5th 508, 517.)  Whether a parent or child is temporarily or permanently absent from the home state "necessarily requires consideration of the parents' intentions, as well as other factors relating to the circumstances of the child's or family's departure from the state where they had been residing." (*In re Aiden L., supra,* at p. 518.)

Here, there was evidence that the family lived in Washington state as late as May 2022.  By September 2022, the family had come to the attention of child welfare workers in Long Beach, California.  The children were first detained in Santa Barbara in October 2022.  When they were first detained, Mother gave Santa Barbara police officers a Washington state driver's license and an address in Long Beach, California.  At that time, the oldest child estimated the family had been in Santa Barbara for about three weeks and lived in Long Beach before that.  In June 2023, S.G. and Z.G.'s biological father, who was then living in Lake Havasu, Arizona, told child welfare workers that the family had lived in Washington state about two years earlier.

Despite this information, Mother did not object in the juvenile court that Washington state, rather than California, should exercise jurisdiction over the children.  Respondent did not raise the issue and the trial court made no inquiry into

10

whether it had jurisdiction under the UCCJEA. No one inquired whether, before the children were initially detained, Mother intended to move the family to California permanently or planned to return to Washington state. Although the children's maternal grandmother lives in California, nothing indicates whether they or Mother have other significant connections with either California or Washington state. (Fam. Code, § 3421, subds. (a)(2), (a)(4).)

Mother concedes the juvenile court initially had emergency jurisdiction over the children. She contends, however, that the court violated the UCCJEA because, after their initial detention, the court failed to inquire whether Washington state had jurisdiction over the children. She contends that, before it made non-emergency orders regarding the children, the juvenile court should have determined whether Mother intended to return to Washington or whether there was an existing custody order from a court in Washington. Respondent concedes the juvenile court should have contacted Washington state, but contends Mother forfeited the issue by failing to raise it with the juvenile court. Alternatively, respondent requests that we conditionally reverse the prior orders with instructions to comply with UCCJEA procedures.

We decline to find the issue forfeited. As the court explained in *In re L.C.* (2023) 90 Cal.App.5th 728, applying the forfeiture doctrine where a court fails to consider potential UCCEJA issues is incompatible with the "comity-driven purpose of the UCCJEA . . . ." (*Id.* at pp. 738-739.) "If applied broadly – including in other states that may also be moved to adopt a forfeiture rule . . . the number of jurisdictional conflicts and potentially inconsistent judgments among states would rise and,

11

in many instances, be left to turn only on whether an attorney had the presence of mind to object (or a perceived strategic interest in objecting) during a particular hearing. As our Supreme Court has observed in another context, where a statute protects the interests of other sovereigns that are separate and distinct from the interests of parents, "'the parents' inaction does not constitute a waiver or otherwise preclude appellate review.'" [Citation.]" (*Id.* at p. 739.)

In addition, applying the forfeiture doctrine here appears to be inconsistent with the UCCEJA itself. Family Code section 3421 provides that California courts have jurisdiction to make a child custody determination "only if" one of the four expressly delineated bases for jurisdiction exists. (*Id.*, subd. (a).) "We are confident the Legislature did not go to the trouble of adopting such a carefully designed and comprehensive scheme only to permit courts, under the auspices of forfeiture, effectively to add a fifth, unspecified category to the statute, one which permits a court to exercise jurisdiction regardless of the location of the child's home state or the preferences of a foreign court simply because the parties before it do not object." (*In re L.C., supra,* 90 Cal.App.5th at p. 739.)

"A court's custody determination remains in effect under the court's emergency jurisdiction until a child custody proceeding has begun in the state with subject matter jurisdiction ([Fam. Code] § 3424, subd. (b)) or until the state of emergency no longer exists [citation]." (*In re A.M.* (2014) 224 Cal.App.4th 593, 598.) Where, as here, a juvenile court has not resolved a jurisdictional issue under the UCCEJA, the appropriate course of action is to conditionally reverse its prior orders and remand the matter with instructions to comply with

12

UCCJEA procedures. (*In re L.C., supra,* 90 Cal.App.5th at pp. 740-741; *In re A.M., supra,* 224 Cal.App.4th at p. 599-600.) If the juvenile court determines that Washington state does not have jurisdiction, or if Washington state declines to exercise jurisdiction, the juvenile court's existing orders will remain in effect. (Fam. Code, § 3424, subd. (b).) If the juvenile court determines that California does not have jurisdiction over the children under the UCCJEA, the court shall proceed as required by the statute and nullify its orders terminating parental rights and any prior orders as necessary. (*In re L.C., supra,* 90 Cal.App.5th at p. 741.)

Section 388 Requests to Change Court Order.

Mother contends the juvenile court abused its discretion when it declined to reinstate reunification services. We are not persuaded.

Section 388 allows a parent to seek modification of a juvenile court order. The parent has the burden to show both changed circumstances and that the proposed modification would be in the best interests of the child. (*In re N.F.* (2021) 68 Cal.App.5th 112, 120.) Relatively recent developments in a parent's life, such newly-established sobriety or mental health stability after a long history of substance abuse or instability, "reflects 'changing,' not changed, circumstances," and are not sufficient to support the modification of existing orders. (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.)

The proposed change must also be in the best interests of the child. Where, as here, family reunification services have been terminated, the court's focus must shift from the parent's interest in the custody of the child to the child's need

13

for permanency and stability. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; *In re Angel B.* (2002) 97 Cal.App.4th 454, 464.)

The juvenile court here did not abuse its discretion when it found that Mother failed to establish her circumstances were changed, rather than changing. After prolonged periods of homelessness, incarceration, hospitalization, and residential treatment, Mother had moved into her apartment only one week before the hearing on her section 388 requests. She had been out of custody for seven months at that point and had completed residential treatment only four months before the hearing.

More importantly, Mother's testimony created significant concern that she lacked insight into her substance abuse and mental health issues. For example, Mother described herself as "a pretty moderate drinker," and insisted that her drinking never impacted her children. By contrast, her then nine-year old daughter told child welfare workers that she hid money from Mother, so Mother would not take it and "'go to the bar.'" Her oldest son described her occasionally becoming "scary irrational" when she had been drinking. Mother also testified that she still believed her children had been "illegally removed" from her custody and that she doesn't understand why. Even though the basis for their removal had been explained to her, Mother did not "specifically" agree the removal was necessary.

Because the decision on a section 388 request is committed to the sound discretion of the juvenile court, we will not disturb the court's determination unless it has ""exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].""" (*In re Stephanie M., supra,* 7 Cal.4th at p. 318.) The appropriate test is whether the court has ""exceeded the bounds of reason . . . .""" (*Id.* at pp. 318-

14

319.)  Here, the recency of Mother's sobriety and mental health stability, and her lack of insight into both her own condition and the reasons for the children's removal provide ample support for the court's order.  There was no abuse of discretion.

*Disposition*

The juvenile court's July 18, 2024 orders terminating family reunification services for S.G. and Z.G., and its March 24, 2025 order terminating Mother's parental rights to Z.G. are conditionally reversed.  The matter is remanded to permit the court to determine whether it has jurisdiction under the UCCJEA.  If the court on remand determines that it has jurisdiction over the children under the UCCEJA, the orders are to be reinstated.  If the court determines that it does not have jurisdiction over the children under the UCCEJA, the court shall proceed as required by the statute and nullify the orders terminating parental rights and other prior orders as necessary.  The orders dated March 24, 2025 and April 4, 2025 denying Mother's requests to change court orders pursuant to section 388 are affirmed.

NOT TO BE PUBLISHED.


YEGAN, Acting P. J.

We concur:


BALTODANO, J.


CODY, J.


15

Gustavo Lavayen, Judge

Superior Court County of Santa Barbara

_____

Jill Smith, under appointment by the Court of Appeal, for Objector and Appellant.

Rachel Van Mullen, County Counsel, Lisa A. Rothstein, Sr. Deputy, for Petitioner and Respondent.