Filed 6/25/26  In re A.V. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re A.V., a Person Coming Under Juvenile Court Law. | B347822 |
| | (Los Angeles County Super. Ct. No. 23CCJP04196) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| D.H., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Dash Talbot, Judge Pro Tempore.  Conditionally vacated and remanded with directions.

Sean Angele Burleigh, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Jacklyn K. Louie, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

————————————————

Appellant-mother D.H. contends the juvenile court erred in issuing its jurisdictional and dispositional orders because it did so without first determining whether it had jurisdiction over her daughter A.V. (born June 2020) under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA, codified in California at Family Code section 3400, et seq.). We agree and conditionally vacate the court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.   *Prior Child Welfare History*

In December 2023, respondent Los Angeles Department of Children and Family Services (DCFS) filed a petition on behalf of both A.V. and her half sister A.J. (born Oct. 2023) under Welfare and Institutions Code section 300, subdivision (b)(1). Count b-1 of the petition alleged Mother was a "current abuser of marijuana, amphetamine, methamphetamine, cocaine and fentanyl" with numerous recent positive drug tests (including at the time of A.J.'s birth). Count b-2 alleged Mother had "a history of mental and emotional problems" and "failed to consistently participate in mental health treatment services and to regularly take the mother's psychotropic medication as prescribed." The juvenile court detained A.J. from Mother; A.V. was "detained at large" as she was reported to be in Las Vegas.

2

In March 2024, the court dismissed the petition as to A.V. because it "was informed by the Court in Las Vegas, Nevada that Las Vegas will be asserting jurisdiction."[1] In April 2024, the court sustained the petition as to A.J.

## B.   *DCFS Investigates a Referral*

In December 2024, DCFS received a referral alleging A.V. was wandering around alone and unsupervised in the apartment building where Mother's boyfriend lived. Mother was apparently homeless but frequently visited her boyfriend and, on this occasion, left A.V. in his care; the boyfriend had "allegedly fallen asleep." Security footage from the complex showed MGM eventually left with A.V.

A children's social worker (CSW) spoke with the CSW assigned to the case involving A.J. The CSW involved in A.J.'s case opined that "the maternal family has been hiding child [A.V.] for over a year and have been avoiding a case with" A.V. Specifically, the "maternal family members have been moving [A.V.] back and forth from California to Las Vegas and have lied to the Department, so [A.V.] would not be removed from the families."

A CSW spoke with both Mother and MGM. MGM stated she brought A.V. from Las Vegas to California to visit Mother.

---

[1] A DCFS report advised that "Mother stated Minor [A.V.] goes back and forth to and from Las Vegas to California," and that A.V. "receives medical care in Las Vegas." During DCFS's initial investigation, Mother stated the maternal grandmother (MGM) was visiting A.V. in Las Vegas and video-called the two of them for the social worker to see. A.V.'s birth certificate shows she was born in Nevada.

Mother said MGM left A.V. with her and her boyfriend (who lived in the same apartment complex as MGM), and A.V. left the apartment when Mother went looking for laundry detergent. Mother claimed A.V. "knows better than to leave the apartment" but the CSW informed Mother and MGM it was "the adult's responsibility" to attend to A.V. and opined that the area they lived in ("Skid Row") was "especially dangerous for children." "Mother minimized the matter and stated [A.V.] was in no harm [*sic*]."

When asked A.V.'s current whereabouts, Mother and MGM claimed she was in Las Vegas, although neither could say when she left, or who picked her up. Both MGM and Mother asserted the maternal uncle (MU) had legal guardianship of A.V.[2] Mother claimed she was no longer abusing substances but could not explain why she was not drug testing in her case involving A.J.[3]

A CSW spoke with the apartment manager of the complex where MGM and Mother's boyfriend lived. The manager confirmed Mother was not on a lease for an apartment in the complex. The manager opined the complex "is not a safe environment for children, as there are many residents who are known for different levels of crime," with some being registered sex offenders. The manager said A.V. "was wandering around the hallway alone and unsupervised for approximately 45 minutes, per the security camera footage." When a security

---

[2] A later "Family Law search" on the "Justice Partner Portal" revealed "no known Family Law history for the family," and the CSW "was unable to locate any legal guardianship documentation under mother or . . . [MU's] names."

[3] In the instant case, both Mother and MGM agreed to drug test but subsequently failed to report to the testing center.

guard saw A.V. wandering around, he went to retrieve her. The security guard knocked on MGM's door, but MGM denied A.V. was her grandchild. The security guard then saw the door to Mother's boyfriend's apartment was slightly open and entered; he found the boyfriend "passed out." The security guard alerted the manager, who arrived and knocked on the door, awakening the boyfriend. The boyfriend "snatched the kid" and slammed the door in their faces. The manager saw "track marks and a blood stream" on the boyfriend's arm and called law enforcement. The manager said Mother had been gone for about three hours, and that security footage showed MGM left with A.V.

In January 2025, the court issued a removal order for A.V., although DCFS could not locate her. Mother claimed she was in Las Vegas with MU. A maternal aunt later told DCFS that Mother had said A.V. was in California and had been under her and MGM's care since October 2024.

### C. *DCFS Files a Petition*

Four days later, DCFS filed a petition under Welfare and Institutions Code section 300, subdivisions (b)(1) and (j) on behalf of A.V. Counts b-1 and b-2 (as well as counts j-1 and j-2) contained the same allegations as the December 2023 petition initially filed on behalf of A.J. and A.V. (that Mother was a substance abuser and had mental health issues). Count b-3 alleged Mother endangered A.V. in December 2024, when A.V. "was found roaming the hallway of the apartment building alone for approximately 45 minutes without adult supervision," and "[t]he tenants who reside in the apartment building have criminal records including being a registered sex offender."

Neither Mother nor A.V. appeared at the initial hearing. The court stated it "read and considered the detention report and

5

the addendum report and makes the following findings and orders based on the information contained therein."  Among other findings, the court concluded "[t]here is a substantial danger to the physical and emotional health of the child and there are no reasonable means by which the child's physical or emotional health may be protected without removing the child from the home . . . and the care, custody and control of the parent(s)/legal guardian(s) from whom the child is being detained."  The court also issued a protective custody warrant for A.V.

A dependency investigator (DI) spoke with Mother at the end of January 2025.  Mother reported A.V. was with MU but refused to provide DCFS with MU's address because she did not want A.V. to grow up in foster care.

At the February 2025 arraignment, the court ordered DCFS to "to contact Nevada CPS regarding UCCJEA issues."  Mother did not appear in person, and the court ordered her to do so the next day.

At the hearing the next day, Mother testified she had not seen A.V. since around the beginning of November 2024.  She explained MU had brought A.V. to the maternal grandfather's house in Gardena, and then A.V. left with MU.  Mother stated A.V. was still with MU and provided the "last known location" she had for MU, an address in Las Vegas.  Mother claimed she last spoke with MU less than a week ago and believed he still lived at the address she provided.

During Mother's testimony, the court asked counsel for DCFS whether the case was "going to be a UCCJEA issue," and counsel responded, "Yes.  There's some confusion.  The child has been moving back and forth many times, it looks like, so we would need to do some more research as to—but at the moment,

6

we still don't know where this child is . . . or how long she's been in Los Angeles." Mother then stated, "The child, she lives in California, but not Los Angeles. I don't know, but as far as my child, she lives in Las Vegas."[4]

The court paused proceedings so DCFS could investigate the address Mother provided. When the hearing continued, DCFS's counsel informed the court that MU had been evicted from that address as of December 9, 2024; Mother claimed she was unaware. After counsel for DCFS reminded the court about the details of the referral—that A.V. was seen in Los Angeles in December 2024—the court found Mother's testimony "completely incredible" and "untruthful." The court informed Mother it would find her in contempt and jail her without bail if she failed to provide information on A.V.'s whereabouts.

Mother provided a phone number for MU to her counsel, who called him so the court could speak with him. MU confirmed A.V. was with him and refused to surrender her. The court then received information from MU's girlfriend that A.V. could be with MGM in Los Angeles. The court ordered DCFS to investigate, and ordered Mother jailed for contempt.

After the court reporter left, the court and counsel apparently spoke with MGM and MU and Mother several more times. At a hearing the next day, the court and counsel summarized the calls, stating they had spoken with MGM and MU several times, and that both confirmed A.V. was in Nevada with them but would not reveal their location, despite Mother "plead[ing] in earnest" for them to do so. Court and counsel had

_____

[4] Prior to this statement, Mother had been testifying about her goddaughter. We assume "[t]he child" in the first sentence refers to the goddaughter, and not A.V.

7

an extended conversation about the situation, during which both Mother's counsel and counsel for DCFS indicated they had spoken with MGM, who stated she was with A.V. in Las Vegas, but either did not know or would not reveal her exact location. MGM offered to permit the court to see A.V. through a video call.

After several days of Mother being jailed and further representations to the court that A.V. was in Las Vegas, Nevada's Children's Protective Services was able to take custody of A.V. from MU and MGM; DCFS flew to Las Vegas and took custody of A.V. that night.

### D. *The Court Removes A.V.*

In March 2025, a DI spoke with A.V., who stated she lived with MU and his girlfriend, but also visited the house Mother lived in with her boyfriend.[5]  The DI spoke with Mother who denied any substance abuse.  When the DI spoke with MGM, MGM again stated that A.V. was living with MU and not Mother. She claimed MU provided A.V. "with clothing and toys" and that A.V. "was always happy and had everything she needed."[6]

At the May 2025 adjudication hearing, the court sustained the petition, again finding "substantial danger to the physical health, safety, protection, or physical or emotional well-being" of A.V., and ordered A.V. removed from Mother.  Mother timely appealed.

---

[5] A.V. said that, when staying with MU, "she and MGM shared a room and slept in the same bed."

[6] In a subsequent DCFS report, MU stated A.V. "has a bedroom with a twin size bed, clothes, shoes, toys, and books."

## DISCUSSION

"The UCCJEA 'is the exclusive method of determining the proper forum in custody disputes involving other jurisdictions and governs juvenile dependency proceedings.' " (*In re R.L.* (2016) 4 Cal.App.5th 125, 136.) "The UCCJEA is designed to avoid jurisdictional conflicts between states and relitigation of custody decisions, promote cooperation between states, and facilitate enforcement of another state's custody decrees." (*Ibid.*)

The UCCJEA defines a child's "home state" to be "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding." (Fam. Code, § 3402, subd. (g).) Under the UCCJEA, California has jurisdiction "if any of the following apply: California is the child's 'home state' (§ 3421, subd. (a)(1)); there is no home state but the child and at least one parent have a 'significant connection' to California and 'substantial evidence' is available in California as to the child's care, protection, training and personal relationships (§ 3421, subd. (a)(2)); another state having jurisdiction has declined to exercise jurisdiction on the ground California is the more appropriate forum (§ 3421, subd. (a)(3)); or no other state has jurisdiction under the foregoing tests (§ 3421, subd. (a)(4))." (*In re Jaheim B.* (2008) 169 Cal.App.4th 1343, 1348–1349.) "[I]f the court is aware that another state (or foreign country) qualifies as the child's home state, the California court must contact the home state court to give it an opportunity to decide whether to exercise its home state jurisdiction." (*In re Aiden L.* (2017) 16 Cal.App.5th 508, 518–519.)

"A court of this state has temporary emergency jurisdiction if the child is present in this state and . . . it is necessary in an

9

emergency to protect the child because the child . . . is subjected to, or threatened with, mistreatment or abuse." (Fam. Code, § 3424, subd. (a).) "When a petition contains allegations of an emergency situation, a court may properly issue an interim custody order to protect the child pending a hearing." (*In re Joseph D.* (1993) 19 Cal.App.4th 678, 688–689.) "A court's custody determination remains in effect under the court's emergency jurisdiction until a child custody proceeding has begun in the state with subject matter jurisdiction (§ 3424, subd. (b)) or until the state of emergency no longer exists." (*In re A.M.* (2014) 224 Cal.App.4th 593, 598.)

### A. *The Court Could Have Assumed Temporary Emergency Jurisdiction Under the UCCJEA*

At the initial detention hearing, the court found A.V. to be in substantial danger due to the statements contained in DCFS's detention report. Specifically, for 45 minutes, A.V. was wandering around an apartment complex located in Skid Row. The apartment complex housed "many residents who are known for different levels of crime," including some registered sex offenders. When a CSW spoke with Mother, rather than take responsibility, she instead blamed A.V., saying she should have "know[n] better" than to leave the apartment. When a CSW pointed out the dangers of the situation, "Mother minimized the matter and stated [A.V.] was in no harm [*sic*]." We deem the court's finding that A.V. was in substantial danger due to this situation to be a determination that an emergency existed.

Under the UCCJEA, a court has "temporary emergency jurisdiction" if the child is present in California and jurisdiction is necessary in an emergency to protect the child. (Fam. Code, § 3424, subd. (a).) Thus, while the court did not take temporary

10

emergency jurisdiction under the UCCJEA, we conclude sufficient grounds existed for it to have done so.

**B.** ***The Court Erred in Failing to Determine Whether It Had Jurisdiction Under the UCCJEA***

Mother contends the juvenile court "erred by asserting jurisdiction over [A.V.] and entering custody orders without undergoing the necessary analysis pursuant to the UCCJEA" because "[t]he record indicates Las Vegas[, Nevada] is [A.V.]'s home state, and there is no indication that Las Vegas[, Nevada] chose to cede jurisdiction to California."[7]  DCFS counters the court properly exercised jurisdiction under Family Code section 3421, subdivision (a)(2) because substantial evidence supports the determination that A.V. lacked a home state.  While we do not agree that the record conclusively indicates Nevada is A.V.'s home state, DCFS misses the point.

"When it is clear some jurisdiction other than California is the home state of the child in question, efforts to consult with the court in that jurisdiction are required under the UCCJEA." (*In re L.C.* (2023) 90 Cal.App.5th 728, 737.)  "Similarly, where the information before a juvenile court objectively suffices to raise a genuine question about whether another jurisdiction is the child's home state, a juvenile court must obtain additional information as necessary to make a home state determination—and is

---

[7] DCFS suggests Mother may have forfeited her argument by failing to raise it below but argues we do "not have to decide that issue here because mother's position fails on the merits and any alleged error was harmless."  Because DCFS does not actually argue Mother forfeited her claim, we reach the merits of her appeal without deciding forfeiture.

11

empowered to contact the court in the other jurisdiction to that end." (*Ibid.*)

Here, there was conflicting evidence on whether Nevada or California was A.V.'s home state, or whether A.V. lacked a home state altogether. After analyzing the information, the juvenile court may well determine it has jurisdiction, either because California is A.V.'s home state, or because she lacks a home state and the other criteria set forth in Family Code section 3421, subdivision (a)(2) apply. But the court erred in failing to conduct the analysis and make a finding. Because it did not find it had jurisdiction, it is irrelevant whether substantial evidence exists to support such a hypothetical finding.

### C. *The Error Is Not Harmless*

DCFS also contends "[a]ny errors in this case should be deemed harmless." We disagree.

The record contains sufficient evidence to raise a genuine question whether Nevada was A.V.'s home state. A.V. was born in Las Vegas. She reportedly received medical care in Las Vegas. She lived with MU in Las Vegas for at least some amount of time and had a room in his apartment, complete with bed, shoes, clothes, toys, and books. The juvenile court dismissed a prior petition involving A.V. because it "was informed by the Court in Las Vegas, Nevada that Las Vegas will be asserting jurisdiction." When A.V. was finally located, it was Nevada's Children's Protective Services that took her into custody. The juvenile court itself recognized potential jurisdiction issues, directing DCFS "to contact Nevada CPS regarding UCCJEA issues," and later confirming with DCFS's counsel that the case was "going to be a UCCJEA issue."

12

But nothing in the record shows the court ever reached out to its Nevada counterpart to determine whether the Nevada court's previous assertion of jurisdiction was ever terminated, or even to solicit the Nevada court's views on which court had jurisdiction in this case. Nor did the court ever expressly determine it had jurisdiction to proceed under the UCCJEA.

On this record, we cannot say the court's failure to determine jurisdiction under the UCCJEA was harmless.

## DISPOSITION

The court's jurisdictional and dispositional orders are conditionally vacated. After remand, the court is directed to take temporary emergency jurisdiction to protect A.V. from actual or threatened abuse or harm. The court shall then hold a hearing to determine whether it has jurisdiction under the UCCJEA and conduct any other proceedings consistent with this opinion. If the court determines it has jurisdiction over A.V. under the UCCJEA, the jurisdictional and dispositional orders are reinstated. If the court determines it lacks jurisdiction over A.V. under the UCCJEA, the court shall proceed as required by the UCCJEA and nullify the jurisdictional and dispositional orders at issue in this appeal.

NOT TO BE PUBLISHED


M. KIM, J.

We concur:



ROTHSCHILD, P. J.                    BENDIX, J.


13